UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>DEAN A. TRAN,<br>Defendant | CRIMINAL No.<br>23-10299-FDS |

**OPPOSITION TO MOTION TO DISMISS**

Now comes the United States and hereby opposes the defendant Dean A. Tran's Motion to Dismiss (Docket Number 22). For the reasons stated below, the government respectfully requests that the Court deny the motion.[1]

**INTRODUCTION**

On November 16, 2023, the grand jury returned an indictment charging 28 counts against the defendant, Dean A. Tran. The indictment includes twenty-five counts of wire fraud, in violation of 18 U.S.C. § 1343 (Counts One – Twenty-Five), and three counts of filing a false tax return, in violation of 26 U.S.C. § 7206(1) (Counts Twenty-Six – Twenty-Eight).

The indictment arises from the defendant's fraudulent collection of unemployment benefits during the COVID-19 pandemic while he was gainfully employed by an automotive parts company (the "Automotive Parts Company"), and his filing of false and fraudulent tax returns that materially underreported rental property income and his income from the Automotive Parts Company.

[1] The government does not believe that oral argument is necessary for the instant motion under L.R. 7.1 and that the Court should deny this motion based on the papers filed.

## FACTS

The defendant is from Fitchburg, Massachusetts and served as a member of the Massachusetts State Senate, representing Worcester and Middlesex counties from 2017-2020. Indictment ¶ 1(a) (Docket Number 1). The defendant ran for re-election in 2020, but lost. His term with the Massachusetts State Senate ended on or about January 5, 2021. (Indictment, ¶ 1). Prior to that, the defendant was a City Councilor in Fitchburg between 2005 and 2017. (Indictment, ¶ 1).

*A. The Defendant Committed Pandemic Unemployment Assistance Fraud*

From about March 2021 and through about September 2021, the defendant defrauded the Massachusetts Division of Unemployment Assistance ("DUA"). The DUA is a state agency that administers unemployment benefits in the Commonwealth of Massachusetts. (Indictment, ¶ 3). The defendant defrauded DUA by filing false and fraudulent claims for pandemic unemployment assistance ("PUA") benefits while working for the Automotive Parts Company. (Indictment, ¶¶ 7-8).

Congress created PUA as part of the Coronavirus Aid, Relief, and Economic Security Act ("CARES" Act), which was signed into law on March 27, 2020. (Indictment, ¶ 11). PUA was intended for individuals who otherwise were not eligible for traditional unemployment benefits, like gig workers, independent contractors and self-employed workers. (Indictment, ¶ 11). In Massachusetts, eligibility for PUA was verified against quarterly earnings reports of W-2 wage earners provided by employers to the Commonwealth of Massachusetts. (Indictment, ¶ 11). Even though PUA was federal program, it was managed and administered by state unemployment agencies like DUA. (Indictment, ¶ 12).

Individuals requesting PUA filed their claims electronically. (Indictment, ¶ 13). As a part of the initial application, claimants were required to meet certain eligibility criteria, to

provide their reason for unemployment, and to certify that they met the program's requirements. (Indictment, ¶ 13). Once approved for the program, claimants had to submit weekly online certifications certifying that they had not worked in the previous week and that they had not received any income during that week. (Indictment, ¶ 14).

The defendant originally filed for traditional unemployment insurance ("UI") benefits on January 6, 2021, the day after his term with the Massachusetts State Senate ended. (Indictment, ¶ 15). On March 12, 2021, the Commonwealth advised him that his unemployment claim had been denied because, as a former State Senator, he was not eligible for traditional unemployment benefits under Massachusetts law. (Indictment, ¶ 16).

*B. <u>The Defendant Worked As Consultant Simultaneous to Unemployment Benefits</u>*

Two days after this denial, on March 14, 2021, the defendant accepted a consulting position with the Automotive Parts Company. (Indictment, ¶ 17). On March 16, 2021, the defendant executed an independent consulting agreement (the "Consulting Agreement") with the Automotive Parts Company earning $90 per hour for his services. (Indictment, ¶ 18). As part of the Consulting Agreement, the defendant agreed to timely file tax returns and make required payments associated with the fees he earned under the Consulting Agreement:

> (c) Consultant is solely responsible for, and will file, on a timely basis, all tax returns and payments required to be filed with, or made to, any federal, state or local tax authority with respect to the performance of services and receipt of fees under this Agreement. Prior to commencing any work under this Agreement, Consultant shall provide Client with a duly executed IRS Form W-9.

(Indictment, ¶ 19).

The term of the Consulting Agreement was for three months until June 16, 2021. The defendant and the Automotive Parts Company agreed to extend the term, which ended on or about September 17, 2021. (Indictment, ¶ 20).

In order to get his $90-per-hour fee, the defendant regularly sent invoices to the Automotive Parts Company. (Indictment, ¶ 20). According to those invoices, the defendant used a variety of names for his consulting services, including "DT Consulting Product and Project Consultant," "DT Consulting Product and Project Management," and "DT Consulting Agile and Scrum Management." (Indictment, ¶ 20). The defendant's invoices show that he commenced work as early as March 20, 2021. (Indictment, ¶ 21). The first invoice that he sent to the Automotive Parts Company was dated April 4, 2021 and the defendant reported fees of $5,355 for work he claimed to have performed between March 20, 2021 and April 3, 2021. (Indictment, ¶ 21).

The defendant continued earning income as a consultant until around the time of September 17, 2021, when he began working as a W-2 employee for the Automotive Parts Company. (Indictment, ¶ 22). Thereafter, the defendant received regular paychecks from the Automotive Parts Company and was no longer paid as a consultant pursuant to invoices that he submitted to the company. (Indictment, ¶ 22).

*C. The Defendant's Application for PUA Benefits Was False*

On March 15, 2021, which was one day after he accepted the consulting position, the defendant applied for PUA benefits, claiming that he satisfied the following eligibility criteria for benefits, "a child or other person in my household for which I am the primary caregiver is unable to attend school or another facility that is closed as a direct result of the COVID-19 public health emergency and such school or facility care is required for me to work." (Indictment, ¶ 23). The defendant was approved for PUA benefits and he received payments between March 2021 and December 2021 totaling approximately **$43,925.** (Indictment, ¶¶ 24-25). The defendant received these PUA benefits – benefits specifically designated for Americans unable to work

during COVID-19 – at the same time that he collected consulting fees totaling approximately $82,602 from the Automotive Parts Company. (Indictment, ¶ 25).

*D. The Defendant's PUA Benefits Were Briefly Suspended*

At one point while the defendant was receiving PUA benefits, DUA briefly suspended his payments. (Indictment, ¶ 26). Rather than stop his fraudulent scheme at that point, the defendant doubled down and appealed his suspension, while his fraudulent scheme deepened. The defendant submitted a sham employment letter (the "Appeal Letter") from a New Hampshire-based company that produced Asian foods (the "Food Company"). (Indictment, ¶ 27). The Appeal Letter offered the defendant an annual salary of $120,000. The defendant also misled DUA by writing in his appeal letter, "[m]y situation has not changed." (Indictment, ¶¶ 27-28).

The defendant knew this statement was false. (Indictment, ¶ 28). The defendant's situation had changed because by April 12, 2021, the defendant was able to work and was working for the Automotive Parts Company. (Indictment, ¶ 28). The defendant also participated in a recorded telephone hearing as part of his PUA appeal. (Indictment, ¶ 29). During the hearing, the defendant concealed the fact that since at least March 20, 2021, he was regularly working for the Automotive Parts Company and that he had received income from the Automotive Parts Company as early as May 4, 2021. (Indictment, ¶ 30).

On June 9, 2021, the defendant's PUA benefits were reinstated. (Indictment, ¶ 31). He received retroactive benefits for the period when his benefit payments had been suspended. (Indictment, ¶ 31). He continued receiving payments through September 9, 2021, at which time the DUA ceased PUA benefit payments for participants. (Indictment, ¶ 32).

The defendant falsely and fraudulently obtained the PUA benefits because (a) he claimed to not be working on weekly certifications while he worked for the Automotive Parts Company;

(b) he claimed to not be earning income while he was receiving payments from the Automotive Parts Company; and (c) he claimed that COVID-19 prevented him from working, but he was working for the Automotive Parts Company as early as March 20, 2021. (Indictment, ¶ 33).

An example of the numerous false weekly certifications from the defendant for the week ending September 4, 2021 is excerpted below:

Earnings and Other Income

Did you work or telework between Sunday, August 29, 2021 and Saturday, September 4, 2021? This includes both full-time and part-time employment.

| Yes | No |
|---|---|

Did you receive any other income between Sunday, August 29, 2021 and Saturday, September 4, 2021? This includes holiday pay, sick pay, and vacation pay.

| Yes | No |
|---|---|

(Indictment, ¶ 34).

After the defendant's PUA benefits ran out on September 9, 2021, just eleven days later, on September 20, 2021, the defendant switched from being a consultant for the Automotive Parts Company to being a W-2 wage earner, with numerous benefits including health insurance, life insurance and retirement benefits. (Indictment, ¶¶ 36-38). If the defendant had become a W-2 employee of the Automotive Parts Company prior to September 2021, the defendant's wages would have been reported to the state and DUA thus would have disqualified from receiving PUA benefits. (Indictment, ¶ 39).

*E. The Defendant Fraudulently Concealed Rental and Consulting Income*[2]

Since at least 2017, and for calendar years 2017, 2018, 2019, 2020, 2021, 2022, the defendant and his wife filed tax returns as "married filing jointly." (Indictment, ¶¶ 40-42). The defendant submitted the returns electronically using a third-party tax return program. (Indictment, ¶ 42).

[2] To be clear, although the government provides background information regarding the tax fraud counts, the defendant has not moved to dismiss these counts.

In 2020, 2021 and 2022, the defendant filed materially false and fraudulent returns by not reporting all of the income that he earned from a rental property that he owned in Fitchburg, Massachusetts. (Indictment, ¶¶ 43-45). In 2020, the defendant underreported rental income by approximately $13,444. In 2021, the defendant underreported rental income by approximately $15,255. (Indictment, ¶ 45). In 2022, the defendant underreported rental income by approximately $15,600. (Indictment, ¶ 45).

In addition to willfully omitting the rental income from his returns, the defendant omitted the $54,270 he made from the Automotive Parts Company in consulting fees in 2021. (Indictment, ¶ 46).

## ARGUMENT

### *A. The Indictment Properly Sets Out a Claim Against the Defendant*

The defendant claims that the indictment's wire fraud charges do not properly state a claim again him. This argument fails. Under First Circuit law, an indictment must set out the elements of the offense and fairly "apprise" the defendant of the case against him. *United States v. Savarese*, 686 F.3d 1, 6 (1st Cir. 2012) ("In general an indictment is adequate if it specifies the elements of the offense charged, fairly apprises the defendant of the charge against which he must defendant, and allows him to contest it without fear of double jeopardy."). When assessing a motion to dismiss, the Court's role is limited to assuring that the allegations are sufficient to inform the defendant of the charge; the Court will not decide whether the government has proven the charges alleged. *United States v. Ngige*, 780 F.3d 497, 502 (1st Cir. 2015) ("[T]he question is not whether the government has presented enough evidence to support the charge, but solely whether the allegations in the indictment are sufficient to apprise the defendant of the charged offense."). Moreover, dismissing an indictment is an extreme measure "reserved for extremely

limited circumstances" and "exercised with caution." *Whitehouse v. United States Dist. Court,* 53 F.3d 1349, 1359 (1st Cir. 1995).

First, the indictment easily satisfies the standard of what is required to be alleged as it sufficiently lays out the elements of the crimes and describes how the defendant's conduct provides the basis for the wire fraud charges that he faces. Under the First Circuit Model Jury Instructions, there are four elements to a charge of wire fraud:

> First, that there was a scheme, substantially as charged in the indictment, to defraud, by means of false or fraudulent pretenses, representations, or promises, in order to obtain money or property;
>
> Second, that the scheme to defraud involved the misrepresentation or concealment of a material fact or matter [or the scheme to obtain money or property by means of false or fraudulent pretenses involved a false statement, assertion, half-truth, or knowing concealment concerning a material fact or matter];
>
> Third, that [defendant] knowingly and willfully participated in this scheme with the intent to defraud; and
>
> Fourth, that for the purpose of executing the scheme or in furtherance of the scheme, [defendant] caused an interstate [or foreign] wire communication to be used, or it was reasonably foreseeable that for the purpose of executing the scheme or in furtherance of the scheme, an interstate [or foreign] wire communication would be used, on or about the date alleged.

*See* First Circuit Pattern Criminal Jury Instructions, § 4.18.1343.

The indictment sufficiently describes each of the elements of wire fraud. First, the scheme to defraud is described; and second, there are numerous examples provided of the misrepresentations and concealment measures taken by the defendant. (Indictment, ¶¶ 7-10, 15-25, 27-35, 48). Third, as described in detail below, in listing all of the defendant's misrepresentations, the government alleges how the defendant's conduct was knowing and willful. Fourth, the government alleges that an interstate wire was actually used. (Indictment, ¶¶ 23-25, 32-35, 48). The government alleges that PUA claims were processed using a server in Colorado, and further alleges that CARES Act program monies used to pay PUA benefits

originated from a bank account in Connecticut, and then were transmitted via interstate wire communications to the claimant's designated bank account. (Indictment, ¶¶ 11-14).

The indictment's allegations concerning the defendant's knowing and willful conduct is substantial. The indictment describes how the defendant concealed his position as a consultant from DUA personnel (Indictment ¶ 30) and how he repeatedly on at least 25 occasions filed false and fraudulent weekly certification from around March 2021 through September 2021.[3] The indictment alleges that the defendant knew that his repeated claims of (a) not working and (b) not earning income on the weekly certifications were false and fraudulent, because he submitted invoices to the Automotive Parts Company showing the work he completed and he earned income from the company each week. (Indictment ¶¶ 32-33). Because the defendant was working for the Automotive Parts Company as early as March 20, 2021, the defendant knew the weekly certifications were false.

To illustrate the defendant's knowledge that these certifications were false, the indictment describes how, on September 5, 2021, the defendant submitted a false certification to the DUA where he claimed to not work during the week ending September 4, 2021. Yet that same day, the defendant also submitted an invoice to the Automotive Parts Company that detailed the work he had performed over the previous week. (Indictment ¶¶ 34-35).

Taking the factual allegations in the indictment as true, the indictment sufficiently describes how the defendant knowingly and willfully defrauded DUA by claiming he was not working and not earning income when he knew this to be false. Putting aside the extensive allegations as to the defendant's fraudulent intent contained in the indictment, whether the government has proved this element is a jury question for trial, not an issue for a motion to

[3] The indictment alleges 25 wire fraud counts, each of which relates to a different weekly claim meaning that the defendant filed at least 25 false weekly certifications.

dismiss. *See United States v. Stepanets*, 879 F.3d 367, 372 (1st Cir. 2018) ("[C]ourts must not inquire into the sufficiency of the evidence underlying [an] indictment."); *see also United States v. Guerrier*, 669 F.3d 1, 4 (1st Cir. 2011); *United States v. Innamorati*, 996 F.2d 456, 477 (1st Cir. 1993). The defendant's claim that the indictment does not properly allege wire fraud fails and the Court should reject it.

*B. <u>The Defendant's Claims Regarding Federalism and the Tenth Amendment Are Wrong</u>*

The defendant's various arguments concerning the Tenth Amendment and federalism are wrong and have already been soundly rejected by numerous federal courts.

The wire fraud statute, 18 U.S.C. § 1343, concerns interstate wire use, regardless of whether the fraudulent scheme itself crosses state lines or is commercial in character. Numerous First Circuit decisions articulate that the wire fraud statute is not concerned with the underlying fraud, but with the use of interstate wires in furtherance of wire fraud. *United States v. McLellan*, 959 F.3d 442, 469 (1st Cir. 2020) ("As we have previously found, the structure, elements, and purpose of the wire fraud statute indicate that its focus is not the fraud itself but the abuse of the instrumentality in furtherance of a fraud."); *United States v. Gordon*, 875 F.3d 26, 37 (1st Cir. 2017) ("[I]n enacting the mail and wire fraud statutes, Congress took aim at the means of conducting a substantive offense, not at the substantive offense itself.").

In this case, the government alleges the defendant used interstate wires in furtherance of his fraud scheme. As described above, the government alleges that PUA claims were processed using a server in Colorado, and further alleges that CARES Act program monies used to pay PUA benefits originated from a bank account in Connecticut, and then were transmitted via interstate wire communications to the claimant's designated bank account. (Indictment, ¶¶ 11-14).

Moreover, the defendant cites a case in his brief in which the Eastern District of Kentucky recently rejected virtually the same argument made by him. In *United States v. Morris*, 572 F.Supp.3d 323, 338–39 (E.D. Ky. 2021),[4] the defendant was charged with three counts of wire fraud after filing three state tax returns that failed to report income that he earned playing basketball in China. The defendant argued that the wire fraud statute was unconstitutional as applied to his case since he only defrauded the Kentucky Department of Revenue, thus "the victim at issue is a state actor." *Id.* at 339. The Court rejected this argument, holding that "the victim of the crime is not the focus of § 1343 or the Commerce Clause" and that the focus instead is the use of interstate wires. *Id.* The Court noted that "[t]he statute does not, by its terms, require that the conduct comprising or underlying the fraudulent scheme itself be an interstate activity. [Defendant's] argument conflates the jurisdictional aspect inherent in the second element—wire use—with the independent first element—the underlying fraudulent scheme." *Id.* The "chief evil targeted by § 1343 is fraudulent interstate wire use, no matter whether the fraud scheme itself is interstate or commercial in character." *Id.* at 340. Similar to *Morris*, in this case, the "focus" of the defendant's fraud is the use of interstate wires to do so, and thus the 25 counts of wire fraud are properly alleged. What matters is not whether the defendant's fraudulent conduct crossed state lines, but that interstate wires were used.

The defendant also challenges the wire fraud counts on the grounds that the defendant's fraud involved a state actor, Massachusetts, and principles of federalism therefore bar his prosecution. The defendant is wrong because the PUA program actually was a federal program

---

[4] The defendant acknowledges the infirmity of his Tenth Amendment claim, writing in his motion that there is no case in the First Circuit supporting his position and of the cases that he did find, the Court held contrary to his position ("There is only limited case law interpreting the wire fraud statute following Bond II, and most of it is against Mr. Tran's position but none in this Circuit so far as research reveals."). *See* Defendant's Motion to Dismiss at 4.

created by Congress under the CARES Act. But even assuming it was a state program, again, for purposes of the wire fraud statute, the focus is not on the victim of the fraud, but on the use of interstate wires. Therefore, the defendant's argument is irrelevant and it does not compromise the wire fraud counts in any manner.

In addition, the defendant's argument that the wire fraud charges cannot stand because it was not "foreseeable" to the defendant that interstate wires would be used also fails. The defendant's foreseeability argument goes to an issue of proof, and not to whether the government's allegations are proper. Issues of proof are not a proper basis to dismiss charges. *See Ngige*, 780 F.3d at 502. Even so, the government does not have to prove that the defendant in fact knew the relevant wire crossed state lines, but instead that the interstate wire would be foreseeable to someone in the defendant's shoes. *United States v. Tum,* 707 F.3d 68, 73 (1st Cir. 2013) ("The wire-fraud statute's interstate-nexus requirement is purely jurisdictional and not a substantive element of the offense, meaning the government did not have to prove that Tum had reason to think that a communication would cross state lines.").

*C. Pandemic Legislation Does Not Exclude Wire Fraud Prosecutions*

Next, the defendant argues that the pandemic legislation "legally exclud[es] the possibility of being defrauded" because the statute requires repayment of benefits that individuals received but were not entitled to. The language of the statutory provision states:

> In the case of individuals who have received amounts of pandemic unemployment assistance to which they were not entitled, the State shall require such individuals to repay the amounts of such pandemic unemployment assistance to the State agency, except that the State agency may waive such repayment if it determines that--
> **(A)** the payment of such pandemic unemployment assistance was without fault on the part of any such individual; and
> **(B)** such repayment would be contrary to equity and good conscience.

The defendant's argument is not logical. First, the defendant essentially claims that he can escape criminal liability because the State can seek repayment for benefits to which the claimant was not entitled. The defendant cites no case law to support this proposition. Nor can he. The state's act of seeking repayment of PUA benefits is distinct from a criminal prosecution predicated on fraud that seeks punishment of the defendant for his actions. Moreover, to the extent the defendant claims his prosecution violates Double Jeopardy, that argument is unavailing.

The Supreme Court has recognized the distinction between civil and criminal remedies and found that they both can be sought. *Hudson v. United States*, 522 U.S. 93, 103 (1997) (holding that defendant could be prosecuted even though they had earlier been subjected to civil penalties) ("Applying traditional double jeopardy principles to the facts of this case, it is clear that the criminal prosecution of these petitioners would not violate the Double Jeopardy Clause. It is evident that Congress intended the OCC money penalties and debarment sanctions imposed for violations of 12 U.S.C. §§ 84 and 375b to be civil in nature."); *United States v. Ursery*, 518 U.S. 267, 287-288 (1996) (in civil forfeiture proceeding, holding that "Congress long has authorized the Government to bring parallel criminal proceedings and civil forfeiture proceedings, and this Court consistently has found civil forfeitures not to constitute punishment under the Double Jeopardy Clause.").

Moreover, the cases cited by the defendant are inapposite. In the *Busic* case, the issue concerned sentencing, not whether the defendant could be properly charged. The defendant was convicted of aiding and abetting a co-defendant who used a firearm to assault federal officers. The defendant was facing a double-sentence enhancement under 18 U.S.C. § 924(c) and 18 U.S.C. § 111, the latter of which imposed a maximum penalty of ten years for assault of a federal officer with a deadly weapon. The Supreme Court held that the defendant could not then be

subject to an additional sentencing enhancement under § 924(c) for the same conduct that formed the basis of the § 111 charge.

Simply put, the defendant's argument is without merit because the defendant did not merely receive benefits to which he was not entitled, but he committed fraud by misleading DUA about his employment and income.

*D. The Defendant's Claim Regarding Partial Unemployment Ignores His Fraud*

The defendant's argument regarding partial unemployment benefits conveniently ignores the essence of the claims against him that he defrauded the government. The defendant argues that the PUA statute allows payments to "partially employed and self-employed" people, and therefore, he was "arguably entitled to receipt of benefits, **even with income.**" Defendant's Motion at 11 (emphasis in original).

First, the defendant's argument should be rejected because it goes to the merits of the case, not to the sufficiency of the allegations made by the government. He argues facts that he intends to introduce at trial that negate his intent. This is not proper grounds to seek dismissal of the charges. *See Ngige*, 780 F.3d at 502. Even so, the defendant's argument fails because the defendant was in fact not eligible for such benefits. There is nothing in the record even suggesting that given the defendant's secretive consulting arrangement with the Automotive Parts Company, that he was eligible for PUA benefits in accordance with 15 U.S.C. § 9025.[5] The defendant was able to work during COVID-19 as he earned substantial income as a consultant for the Automotive Parts Company. Moreover, even if the defendant was entitled to some benefits, he never disclosed to DUA or his hearings officer that he was collecting income from the Automotive Parts Company at the same time he filed unemployment claims. Again, as

[5] As further evidence of the defendant's bad faith, as alleged in the Indictment, the defendant concealed his consulting income from the IRS on his 2021 tax return.

elsewhere in his motion, the defendant is arguing the merits of the charges, which is not an issue to be decided at the motion to dismiss stage.

*E.* *The Government Is Not Estopped from Prosecuting the Defendant*

The defendant's collateral estoppel argument fails. The fact that his unemployment benefits were resumed after being briefly suspended does not preclude his prosecution for wire fraud. As the Supreme Court holds, "collateral estoppel cannot apply when the party against whom the earlier decision is asserted did not have a 'full and fair opportunity' to litigate that issue in the earlier case." *Allen v. McCurry*, 449 U.S. 90, 95 (1980). The First Circuit similarly describes collateral estoppel as "bar[ring] relitigation of previously decided issues that were essential to the [earlier] judgment." *United States v. Ledee*, 772 F.3d 21, 23 (1st Cir. 2014).

The defendant's collateral estoppel argument fails because the government was not a party to the DUA hearing nor was the issue of the defendant's alleged wire fraud decided as part of that proceeding. The United States has not been previously heard on this matter and is not precluded from prosecuting the defendant for it now. Moreover, the defendant's collateral estoppel argument fails because he defrauded the hearing officer. While the hearing officer's focus was the defendant's eligibility for PUA benefits, the issue in this case is the defendant's fraudulent scheme to obtain PUA benefits that he was not entitled to receive. The defendant claims that because the hearing officer—based on the defendant's misrepresentations at his appeal hearing—determined that the defendant was eligible to receive PUA benefits, the federal government is estopped from arguing that he was actually ineligible for benefits. This argument is not based in law or logic.

The DUA ceased the defendant's PUA benefits on April 9, 2021. (Indictment, ¶ 26). In an effort to reinstate his benefits, he filed an appeal with the false assertion that his work situation had not changed since he was initially approved for benefits and provided a sham

employment offer letter with his appeal. (Indictment, ¶¶ 27-28). At his appeal hearing, he falsely testified under oath regarding the employment letter and concealed his ongoing consulting work from the hearing officer. (Indictment, 30). Now, the defendant asks this Court to shield his fraud from investigation and prosecution with no authority supporting his position. Doing so would create a perverse incentive for applicants to lie to state agencies in the course of pursuing benefits because their deceit would be immune from prosecution. The defendant's collateral estoppel argument should be rejected by the Court.

*F. The Defendant's Argument Regarding Prosecutorial Misconduct Is Not True*

The defendant argues that, by executing a search warrant on his Hotmail account, the government breached the attorney-client privilege. Yet the federal government is not precluded from obtaining email records from a duly sworn search warrant signed by a federal magistrate simply because the target of the search warrant retained counsel for an ongoing and unrelated state case.

On December 14, 2023, as part of automatic discovery, the government provided copies of the search warrant application, the search warrant, the affidavit in support of the search warrant and the attachments to the warrant to the defendant. Also on December 14, 2023, the government notified defendant's counsel in its automatic discovery letter to contact the U.S. Attorney's office to make arrangements to receive a copy of the search warrant return, that is the Hotmail emails received from Microsoft. Since then, the defendant has never contacted the U.S. Attorney's office to obtain a copy of the search warrant return. The defendant has no basis nor any facts to assert prosecutorial misconduct and his claim on this point is therefore unsupported by any facts. The defendant cannot credibly claim that the government has invaded on any privilege he may enjoy, nor could he. The defendant does not identify any privileged communications or suggest that any privileged communications were reviewed by the

government or the Grand Jury. There is no evidence that the government has breached any attorney-client privilege and the defendant's argument therefore rings hollow.

In addition, the defendant argues that the indictment should be dismissed because of an alleged "breach of promise" by the government in subpoenaing records from his sister's company. The government is not aware of what "promise" to which the defendant refers. Moreover, the defendant's argument is not supported by any federal authority. Instead, the defendant rests his argument on a nineteenth century Massachusetts case, *Commonwealth v. St. John*, 173 Mass. 566, 569 (1899).

Moreover, the defendant's objection to the subpoena to his sister's Company has already been litigated and soundly rejected by this Court. On October 26, 2023, the Honorable United States Magistrate Judge M. Page Kelley issued a report and recommendation recommending that the motion to quash be denied, and on November 14, 2023, the Honorable United States District Judge Patti B. Saris adopted the report and recommendation and denied the motion to quash. See Exhibit A (Copy of Report and Recommendation on Motion to Quash) (the "Motion to Quash Decision"). In the "Motion to Quash Decision", the Court held that the defendant did not have standing to challenge the subpoenas served on his sister, her husband, and their company. The Court also decided that even assuming the defendant had standing, the motion still failed on the merits.

The defendant also misstates the timeline of events that occurred here. While the defendant writes, "[w]hile Mr. Tran considered the efficacy of an appeal, the Government went ahead and seized the subpoenaed records by Search Warrant." That statement is wrong. First, the government never obtained a search warrant for the sister, her husband or company records. Second, the search warrant that the government obtained to search the defendant's residence preceded the issuance of the subpoenas at issue. The search at the defendant's residence

occurred on June 22, 2023, a grand jury subpoena was served on the sister's company on June 30, 2023, and subpoenas were served on the sister and her husband on July 7, 2023. Moreover, the Court held in the Motion to Quash Decision that these subpoenas were a proper investigative tool used by the government. Motion to Quash Decision, at 7 ("The court declines to find that there is anything intimidating or irregular generally about the government seeking records from a witness after he or she has testified before the grand jury, even if she testified favorably to a prospective defendant. This is an entirely expected progression for an investigation."). Moreover, the Court soundly rejected the defendant's similarly baseless and unreasonable arguments in his motion to quash, holding "[m]ovant's arguments as to relevant and oppressiveness are not remotely persuasive" and "[w]hether because movant lacks standing or, if he has standing, because his arguments are devoid of factual and legal support, the motion to quash should be denied." Motion to Quash Decision, at 8, 11.

## **CONCLUSION**

For the reasons stated above, the government respectfully requests that the Court deny the defendant's Motion to Dismiss (Docket Number 22).

Dated: March 28, 2024

JOSHUA S. LEVY
Acting United States Attorney

/s/ *John T. Mulcahy*
Dustin Chao
John T. Mulcahy
Assistant U.S. Attorneys

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants.

*/s/ John T. Mulcahy*
John T. Mulcahy
Assistant U.S. Attorney

Date: March 28, 2024