United States of America
District of Massachusetts

Suffolk, ss.

United States

v. 23-cr-10299

Dean Tran

**Post-trial Motion #1**
**Renewed Motion to Acquit**

Now comes the Defendant who moves for relief on sundry grounds, in addition to those previously put before the Court.

## Argument

### I. The Court erred in giving the Allen charge over objection

**a. Immediate facts**

Courts have, consistently, hesitated in the face of what to do with deadlocked juries. In this case, the Court gave the eponymous Allen charge over objection.[1] *See Day 7 Transcript*, at 7-5 ("Mr. John Walsh: We are not in favor of giving the Allen charge."). At the time given, about 230PM on Day 7, the jury had been out since about 1PM on Day 6. The Jury had the case for a little over 8 hours over two days. The jury returned with a question which read ""If the jury cannot reach an agreement about some or not all counts, what will the outcome of the trial be?" This was the jury's second question.

**b. Contrary to the Government's argument, the was nothing "unequivocal" about the question.**

---

[1] The Allen charge is named for Allen v. United States, 164 U.S. 492 (1896). Even state courts are very hesitant in this circumstance. The Massachusetts state analog to the Allen charge is the Tuey-Rodriquez charge. Commonwealth v. Tuey, 8 Cush. 1 (1851); Commonwealth v. Rodriquez, 364 Mass. 87 (1973).

After reading the question to the parties, the Government took the position that the Allen was the appropriate answer to the question. The Government thought that the Jury's question was "pretty unequivocal." *Day 7 Transcript*, at 7-6 ("Mr. Chao: I guess, your Honor, the only reason I hesitate is because it does seem pretty unequivocal. The message that the jury has given according to the note is consistent with when courts traditionally give an Allen charge instruction."). And so, the Court gave the Allen charge over objection of the Defendant.

Unfortunately, the question did not report a deadlock. All it did was ask what the consequences **would be** of a deadlock. The operative words were "If [we] cannot reach an agreement about some…counts, what will the outcome…be?" This is the very definition of an indirect question. The jury posed a hypothetical. The Court, urged on by the Government, assumed the truth of the hypothetical and delivered overly strong medicine.

The First Circuit Pattern instructions specifically instruct that the Court must wait for a direct report of deadlock:

> A direct charge like this must be used once the jury indicates deadlock, rather than an indirect response to a question that may imply an obligation to deliberate indefinitely. See United States v. Manning, 79 F.3d 212, 222-23 (1st Cir. 1996) (finding it improper to respond to jury question whether it was obliged to reach a verdict by asking "Would reading any portion of the testimony to you assist you in reaching a decision?")

*First Circuit Pattern Criminal Jury Instructions*, at 130, §6.06 (comment (3)) (Nov. 1997). In this regard, the case bore a similarity to Manning where the jury asked "We do not have an [sic] unanimous decision on Count Number Two. Must we continue to discuss until we have? It is apparent that we'll not change our minds." Manning, 79 F.3d at 222. This was not a case where "unequivocal jury declaration of deadlock amply justified" the Allen charge. US v. Vanvliet, 542 F.5d 259, 269 (1st Cir. 2008).

**c. The Allen charge, dangerous under the best of circumstances, was a grave and prejudicial error here**

"A supplementary charge instructing a deadlocked jury to go back again and try to reach a verdict, although permitted in this circuit… must be used with great caution." United States v. Anguilo, 485 F.2d 37, 39 (1st Cir. 1973). The Allen charge is a relic which poses inordinate danger to the Defendant. "[The Allen charge] has been described as a 'dynamite' charge because, due to its potentially coercive effect, it, '[l]ike dynamite... should be used with great caution.'" US v. Amaro-Santiago, 824 F.3d 154 (1st Cir. 2016) *quoting* US v. Flannery, 451 F.2d 880, 883 (1st Cir. 1973).

"The only reason we have for not prohibiting the Allen charge altogether, as has been done in several other circuits, is our feeling that there may be times when, for the sake of judicial economy, jurors need to be reminded that they should deliberate together in an atmosphere of mutual deference and respect." Anguilo, at 40. Here, where the jurors had reached some verdicts, there was no need for a reminder to work together with "deference and respect." Nor, having been at it a short while was there any need for judicial economy.

In identifying problems with the Allen charge, the First Circuit has noted, "either directly or by implication it may place the burden of reconsideration upon jurors holding a minority opinion, thereby losing for the defendant whatever influence a minority in favor of acquittal might have in the jury room… such a charge may cause a jury to agree when they might otherwise never have come to agreement, thereby losing for the defendant whatever safeguard he might have had in a hung jury, a declaration of mistrial, and either a new trial or a subsequent decision by the prosecutor not to retry the case." The fact that the jury bothered to inquire, hypothetically, about

the consequences of a mistrial means that there was a real possibility that the jury might have hung.[2]

Moreover, the jury had not been at it long, and had only asked an indirect hypothetical that hinted at lack of agreement. The Court, *sua sponte* giving the Allen charge, particular in such a short time frame was highly prejudicial. *See* Flannery, at 883 ("There was no call for the court to employ it, sua sponte, when the jury had been deliberating only three hours, and had reported no difficulties in agreeing."). Nor was this an occasion where it was called for, the Court could have simply answered the hypothetical, about the effects of a deadlock, and sent them back on their way. To give the Allen charge, over objection, at the slightest hint of a trouble was gratuitious. *See* Flannery, at 883 ("This charge has been called the dynamite charge. Like dynamite, it should be used with great caution, and **only when absolutely necessary**.") (emphasis added). *See Also* Commonwealth v. Firmin, 89 Mass. App. Ct. 62, 65 (2016) (" Because it "has a 'sting' and can, if improperly phrased or improvidently given, risk 'coercion' of the jury to reach a verdict with which they are not fully comfortable,"… a Tuey-Rodriquez charge "should not be employed prematurely or indiscriminately.")

> [A] Tuey-Rodriquez charge "should not be employed prematurely or indiscriminately." Commonwealth v. Rollins, 354 Mass. 630, 638 (1968). See Rodriquez, supra at 100 (modified Tuey instruction may not be used prematurely); Jenkins, supra (Tuey-Rodriquez instruction should "never" be given prematurely); O'Brien, 65 Mass. App. Ct. at 296 ("instructions given to a jury that have not reached the point of deadlock may have an impermissibly coercive effect"). "A judge crosses the line between enlightening the jurors' understanding [of the law] and coercing them [into returning a verdict] when 'he overcomes the will by the weight of his authority.'" Commonwealth v. Diaz, 19 Mass. App. Ct. 29, 34 (1984), quoting from Horning v. District of Columbia, 254 U.S. 135, 139 (1920)

---

[2] The jury in this case did in fact hang on the first five counts of Wire Fraud. However, after the Question, about 220PM, the Jury retired for another hour and half before returning just before 4PM. Without having inquired about those counts about which the jury was stuck on, it is impossible to know if the Jury minority were coerced to agree on counts which they would not have but for the Allen charge.

> (Brandeis, J., dissenting). We agree with the defendant that because the jury deliberations were not "due and thorough," the judge's instruction was "inappropriate." Carnes, supra at 829.

Firmin, at 65.

**d. The Allen Charge is Unconstitutional because of its coercive effect on the right to a jury trial.**

The Third Circuit has long held that the Allen charge is reversible error. "Fioravanti represented a watershed in our jurisprudence. Its prohibition on the use of the majority/minority instruction which was not found to be error in Allen v. United States, and its warning that the subsequent use of an Allen charge would constitute reversible error in the absence of extraordinary circumstances established strict limits on the content of the jury instructions not necessarily required by Supreme Court precedent." US v. Eastern Medical Billing Inc., 230 F.3d 600, 608 (3rd Cir. 2000). "Thus is revealed the very real treachery of the Allen Charge…It departs from the sole legitimate purpose of a jury to bring back a verdict based on the law and the evidence received in open court, and substitutes therefore a direction that they be influenced by some sort of Gallup Poll conducted in the deliberation room…All of this constitutes an unwarranted judicial invasion into the exclusive province of the jury and adds the blind imprimatur of the trial court to a matter of which it has absolutely no information: the results of the preliminary ballotting in the jury room. To the product of this informal poll is added the gloss of trial judge approval…Moreover, the Allen Charge serves to substitute the coercive influence of any early polling of the jury for the give and take of group deliberation, a basic attribute of the jury system often expressed as a major characteristic justifying its continuance in our judicial system." United States v. Fioravanti, 412 F.2d 407, 417 (3rd Cir. 1969).

Nor is there any doubt that it strong undermines the important constitutional functions of a jury.

> The requirement of a unanimous jury verdict for criminal cases in the federal courts and in all but a handful of states is eloquent testimonial that something more than a majority vote is desired. In this respect the jury system is unique. No other deliberative body in the world requires unanimity — be it the Congress of the United States, the College of Cardinals, the Boards of Directors or our great corporations, this court of appeals, or the United States Supreme Court. The proponents of the jury system maintain that a greater degree of accuracy is guaranteed from this process of give and take which is invariably essential to reaching unanimity.
>
> In addition to the unsettling effect which a strategically inserted Allen Charge might have on the constitutional requirement of unanimity, its effect on the necessity for proof beyond a reasonable doubt makes it doubly circumspect. The presumption of innocence protects the defendant until such time as the prosecutor convinces the jury beyond a reasonable doubt that the defendant has committed the crime for which he stands accused.
>
> We are convinced that the traditional measure of proof in criminal cases envisions a "subjective standard" — viz, each individual juror must be convinced of the defendant's guilt beyond a reasonable doubt. To maintain that an objective standard governs could nullify the constitutionally mandated requirement of unanimity of verdict. Under any standard other than an individual juror's determination, would not "the doubt of a single juror in the face of eleven votes for conviction [be] * * * per se unreasonable?"

Fioravanti, at 417-419. "The Allen Charge causes more trouble in the administration of justice than it is worth." Andrews v. United States, 309 F.2d 127, 129 (5th Cir. 1962) (Wisdom, J. dissenting). The Third Circuit has so strenuously objected to the Allen charge that it has found it to be plain error. Government of V.I. v. Hernandez, 476 F.2d 791 (3rd Cir. 1973). In this case there are no redeeming features to have saved it. It was given over objection. It was given sua sponte. The jury had not "unequivocally" indicated deadlock.

## II. The Court erred in its reasonable doubt instruction

The Court should have used the Webster Charge. Commonwealth v. Webster 5 Cush. 295; 59 Mass. 295 (1850). Being the seminal and historical definition of reasonable doubt, it is an important and significant instruction. It has received the approval of the Supreme Court. *See*Victor v. Nebraska, 511 U.S. 1 (1994). "California Supreme Court characterized the Webster instruction as "probably the most satisfactory definition ever given to the words `reasonable doubt' in any case known to criminal jurisprudence."" Victor, at 9 *quoting* People v. Strong, 30 Cal. 151, 155 (1866).

The reasonable doubt instruction is the most crucial phase of the trial. The Court also did not give the instruction that it indicated that it would:

> Later today I'm going to circulate my draft jury instructions. The reasonable doubt instruction, I have a version which I'll circulate and we can talk about it then.
>
> This moral certainty language I don't think is particularly helpful. I mean, I'm not subject to what the SJC says. I think for an average person in 2024 it doesn't really tell them much of anything, but I will circulate my own variation on this, which basically walks up a ladder that, you know, possibility is not reasonable doubt, equal probability is not reasonable doubt, probability alone is not reasonable doubt, even a strong probability, it has to be beyond a reasonable doubt.

*Day 5 Transcript*, at 5-7. This ladder instruction, not the Defendant's preferred iteration, would certainly have tried hard to present the high level of necessary certitude. The instruction ultimately given did not compare reasonable doubt to a possibility, probability or strong probability.

> You may not convict the defendant based on specification or conjecture.
> You may not convict the defendant if you decide that it is equally likely that he is guilty or not guilty. If you decide that the evidence would reasonably permit either of two conclusions, either that he is guilty as charged, or that he is not guilty, you must find the defendant not guilty. You may not convict the defendant if you decide it is only probable or even strongly probable that he is guilty. A mere probability of guilty is not guilt beyond a reasonable doubt.

*Day 6 Transcript*, 6-124 to 6-125. The instruction didn't define reasonably doubt in detail. It explained what reasonable doubt was not. But it did not convey the high level of certainty required. This was error. "The Due Process Clause requires the government to prove a criminal defendant's guilt beyond a reasonable doubt, and trial courts must avoid defining reasonable doubt so as to lead the jury to convict on a lesser showing than due process requires." Victor, at 22. The instruction did not "emphasize[] the fact that those probabilities must be so strong as to exclude any reasonable doubt." Victor, at 22 *quoting* Dunbar v. US, 156 U.S. 185, 199 (1895). The instructions did not "[i]instruct the jurors that they must have an abiding conviction to the defendant's guilt" which "does much to alleviate any concern." Victor, at 21.

### III. The Government did not introduce sufficient evidence of the crime of Wire Fraud

Here the Defendant reasserts an argument from the Motions to Acquit. All of the Wire fraud counts are insufficient because of lack of evidence of interstate transmission which was foreseeable.

Wire fraud, to have a jurisdictional federal basis, requires a transmission in interstate commerce. "Wire fraud has three elements: '1) a scheme to defraud by means of false pretenses, 2) the defendant's knowing and willful participation in the scheme with the intent to defraud, and 3) the use of interstate wire communications in furtherance of the scheme.'" United States v. Buoi, 84 F.4th at 31, 38 (1st Cir. 2023) *quoting* United States v. Casseiere, 4 F.3d 1006, 1011 (1st Cir. 1993). Amongst the Government's proof obligations is to establish some foreseeability that the wire fraud would cross state lines. *See* United States v. Turn, 707 F.3d 68, 72 (1st Cir. 2013) (Although "the government need not have shown that he "personally use[d] the wires," but only

that "s**uch use was a reasonably foreseeable** part of the scheme in which [he] participated.") (emphasis added).

In the indictment the Grand Jury honed in on two critical potential sources of interstate transmission (1) the FAST Enterprises server in Colorado, through which the Massachusetts Department of Unemployment Assistance ("MassDUA") and (2) the asserted fact that MassDUA held funds in People's United Bank which is headquartered in Connecticut. *Indictment ¶13-14* (describing server in Colorado); *Id.* at ¶12 (referring to the People's United Bank in Connecticut).

The Government did not introduce any evidence into the record of People's United Bank or its location.[3] Therefore this cannot serve as a basis for the interstate nexus.

As for the server in Colorado, the Government had only limited information.[4] The Government did fly in a witness from Colorado. Mr. Lucas Bremseth works at FAST Enterprises, which is a contractor that MassDUA uses to run the Pandemic Unemployment Assistance. Mr. Bremseth testified on direct examination about his company having a server in Colorado. On cross-examination, Mr. Bremseth testified that his company "has some offices here" in Massachusetts and occasionally works out of the offices of Massachusetts governmental clients. *Transcript*, 4-55.

More critically, Mr. Bremseth testified about the web portal application used by MassDUA. He testified that the screenshots shown to the jury "had a banner that says 'mass.gov.'" *Transcript*, 4-55.

[3] People's United Bank is also licensed to do business in Massachusetts and has several branches in Massachusetts. This is not in the record of evidence before the Jury however. If the Government had entered any evidence about People's United Bank, the Defense would have offered evidence from the Massachusetts Commissioner of Banks to show that it was possible that all relevant conduct occurred in Massachusetts between Massachusetts parties.

[4] The Court struck, at Defense Objection, when Agent Rosen testified about the server in Colorado finding it was hearsay. *Transcript*, 4-22.

> Q. So to the user are there any indications that that [this] isn't a Massachusetts government site based in Massachusetts?
>
> Mr. Chao: Objection, Your Honor.
>
> The Court: Overruled.
>
> **A. I don't believe so.**

*Transcript*, at 4-56 (emphasis added).  There was no way for the user to know that the MassDUA portal wasn't a Massachusetts government site in Massachusetts.  There was no way for Mr. Tran, or any user, to know or foresee that the portal was connected to an out-of-state server, run by an entity not the Massachusetts Government, or any connection with out-of-state entities.

The Government's other evidence, from Agent Rosen, that any intestate transmission occurred was struck by the Court at the Defense objection.  *Transcript*, at 4-21 to 4-22 ("Q. How do you know, by the way, the server is in Colorado? A. My direct conversations with DUA, as well as with the vendor, FAST Enterprises.  Mr. Walsh: Objection. Motion to Strike.  The Court: All right.  It's certainly hearsay, so I will sustain the objection and strike the answer.")

Basically, the Government rests on the bare assumption that because a computer was involved it was foreseeable that state lines would be crossed.  The First Circuit and other courts have expressly rejected the rationale underlying this argument. United State v. Lewis, 554 F.3d 208, 213 (1st Cir. 2009) (citing to wire fraud statute, "These provisions, too, have long been held to require actual crossing of a state or national border "); United States v. Kieffer,  681  F.3d  1143, 1155  (10th Cir. 2012) ("[O]ne individual's use of the internet, 'standing alone,' does not  establish an interstate transmission . . . because the origin and host servers, whether one and the same or separate, might be located in the same state as the computer used to access the website."); United States v. Biyiklioglu, 652 F. App'x 274, slip. Op.# 14-31003, at 7 (5th Cir. 2016) (" The use of the Internet alone is insufficient to establish the required interstate nexus.").

Though the Government had evidence at its disposal relating to the Banks, it did not present it, either in its own case-in-chief or in cross during the Defense presentation.[5] *Cf.* United States v. Jinian, 725 F.3d 954 (9th Cir. 2013) (foreseeable that banks would use interstate wires); United States v. Turn, 707 F.3d 68, 73 (1st Cir. 2013) (defrauding a state benefit program, with intra-state communications and intra-state representatives was nonetheless not a "Maine-centric" scheme of multiple interstate components with system servers in Sout Carolina, data verification in Florida, and involving out-of-state banks in Ohio and Illinois.). In this case the only evidence before the jury was about the server in Colorado from FAST Enterprises. The expert representative from FAST Enterprises testified that he was pretty sure that there was no way for a user to know that the system was not a Massachusetts server, from a Massachusetts Government website in Massachusetts. By definition if the expert involved thinks there was no way for the user to know that the web platform was handled by an out-of-state contractor, then it was not foreseeable to Mr. Tran or any other user.

"[A]ll that the government had to show was that it was reasonably foreseeable to a person in T[ran']s shoes that a wire communication would be made to further the scheme." Turn, at 73-74. Even using a reasonable person standard, the nexus requirement simply isn't met. The out-of-state subcontractor apparently went to some lengths to make their web platform indistinguishable from the Mass. Government website.

**IV. The Government's Wire Fraud counts fail on materiality grounds**

[5] Because the Defendant made a timely motion at the close of the Government's Case, and renewed it at the close of the evidence, his objection is preserved.

    a. **There is no evidence of fraud or deception in Mr. Tran's certification about his childcare needs, and so for those weekly certifications (14) where that was the only boxed checked, the wire fraud counts cannot be sustained.**

The Government did not contest, or even investigate, the accuracy of Mr. Trann's claimed eligibility for PUA benefits under the child care category, according to Agent Rosen. At least for the weeks where it was the only eligibility box he checked.

> Q. So for approximately 10 weeks Mr. Tran, in relation to this, only checked one box relating to childcare?
>
> A. Up until this date, correct.
>
> Q. Okay. So in the course of your investigation, you were trying to ascertain whether Mr. Tran's self-reported childcare excuse for receiving PUA was accurate, correct?
>
> A. Can you say that again, just be a little slower.
>
> Q. In the course of your investigation, you were trying to make sure Mr. Tran was truthful when he reported that he couldn't work because of a childcare situation?
>
> A. That was one of the eligibilities he picked, yes.
>
> Q. So did you investigate in relation to whether or not the Fitchburg schools were closed in this week or any of the surrounding weeks?
>
> A. No.
>
> Q. Were the Fitchburg schools closed in this week or any of the surrounding weeks?
>
> A. I just testified I didn't look into it.

*Transcript*, 4-59 to 4-60 (cross-exam of Agent Rosen).  Mr. Tran made a true statement about his eligibility which the Government has not refuted.

b. **Even had he disclosed the 1A Auto Contract Work, Mr. Tran would still have been eligible**

As Agent Rosen testified, it was possible to work a part-time contract gig and receive income and **still** be eligible for PUA benefits.

> Q. To your knowledge, is it possible to receive income from a part-time job or gig and then be eligible to receive pandemic benefits?
>
> A. If the claimant provides that income in their weekly certifications, the system DUA, and through the PUA portal, will determine if they're eligible for their full weekly amount, part of it or none every week, but without that information DUA cannot make that information.

*Transcript*, at 4-68

> Q. So I can make $50,000 a year during the pandemic and still have been eligible to receive DUA if it was part-time work?
>
> A. Potentially. It depends on what the weekly benefit amount was determined for that specific claimant and how much they made every week.

*Id.* As Agent Rosen testified on cross-examination, Mr. Tran made between $54,000 and $55,000 on the 1A Auto consulting contract. *Id.* at 4-68 to 4-69.

With the backdating to January 2021, PUA covered 35 weeks. There are, as a matter of the calendar, 24 weeks and 5 days between Mr. Tran's 3/15/2021 PUA application and the 9/4/2021 termination of the PUA program. According to Jennifer Lavin from DUA, it is possible to have part-time employment and get paid for it and **still** receive PUA.

> Q. Okay. In relation to pandemic unemployment, is it true that you could be working and receiving income while still being eligible for PUA?
>
> A. Only if you are working part time and your earnings were not going to be greater than what your weekly benefit amount would be.

> Q. So if I were working a part-time job during the pandemic, I could somehow notify DUA that I was -- I had some small income and they would adjust my benefit accordingly?
>
> A. Correct.

*Transcript*, at 2-92 (cross of Jennifer Lavin).

c. **Mr. Tran qualified for PUA based on other eligibility criteria, which he did not claim**

Mr. Tran could have qualified for PUA benefits under several different criteria. The government, through Agent Rosen, admitted as much.

> Q. Okay. Let's step sideways into the eligibility criteria for a minute. Was self-employment one of them?
>
> A. Yes.
>
> Q. Was Mr. Tran self-employed during this period?
>
> A. Prior to his pandemic claim?
>
> Q. During his pandemic claim, was Mr. Tran self-employed?
>
> A. He was, yes.
>
> Q. Is contract work one of the eligibility criteria?
>
> A. Yes.
>
> Q. And during this period wasn't Mr. Tran working under a contract?
>
> A. Yes.

*Transcript*, at 4-62. Agent Rosen, despite the massive trove of materials seized by the federal agents under the search warrant, did not find any evidence of Mr. Tran's job search but she also admitted that the Government did not look for any. *Transcript*, at 4-64 to 4-65. Agent Rosen also

briefly testified about a PUA eligibility criteria for those who might be obstructed in reaching a work site due to the pandemic (such as by interstate quarantine rules).

> Q. Does the Pandemic Unemployment Assistance program take into account interstate quarantine rules in relation to your ability to accept employment?
>
> A. There is a criteria that says that if they are unable to reach their place of employment due to COVID-19 pandemic health emergency.

*Transcript*, at 4-75.

To put this into perspective, Mr. Tran could have qualified for (but did not claim) several potential eligibility criteria:

- Self-employment
- Contract work
- Partial Employment
- Job effect from quarantine rules

In addition to his claimed eligibility for childcare issues, which the Government did not investigate or disprove. **<u>If he is eligible to obtain PUA benefits through other categories, then alleged misrepresentations did not gain him property which he wouldn't have gotten but for the deception</u>**. It could be phrased that the misrepresentations are not material. Materiality is an element of wire fraud. <u>Neder v. United States</u>, 527 U.S. 1, 4 (1999) ("We also hold that materiality is an element of the federal mail fraud, wire fraud, and bank fraud statutes under which the petitioner was also charged.").

To put the materiality element in context, the lies or deception must have gained Mr. Tran something specific (money or property) which he wouldn't have gotten otherwise. The Governments evidence shows no materiality to the alleged misrepresentations, when Mr. Tran

would qualify for the benefits anyway. The lies and deception must make a difference and here they do not. *See* Neder v. United States, 527 U.S. 1, 25 (1999) ("Accordingly, we hold that materiality of falsehood is an element of the federal mail fraud, wire fraud, and bank fraud statutes.").

Thus, contrary to the Government's pretrial filings, Mr. Tran's potential eligibility for PUA under other categories is sharply relevant because it eliminates the Government's eligibility to prove that the alleged falsehoods are material.

d. **A Wire Fraud Scheme cannot exist solely on non-disclosure**

Given Mr. Tran's eligibility under other categories for PUA benefits, the alleged misrepresentation do not advance the Governments case. They are not material because Mr. Tran could (and should have) gotten to the end result by other unsullied means. This means that the only surviving leg upon which the Government may base its case (the alleged affirmative misrepresentations being immaterial) is the omission represented by failing to report the income from the part-time consulting contract with A1 Auto.

It has long been the law that mere omissions, or simple non-disclosure, will not sustain a wire fraud indictment. *See* Reynolds v. East Dyer Development Co., 882 F.2d 1249, 1252 (7th Cir. 1989) ("The Reynolds have not cited any cases in which mere failure to disclose, absent something more, was held to be fraud under the mail and wire fraud statutes, even in spite of the broad language some of those cases use."); United States v. Biesiadecki, 933 F.2d 539, 542 (7th Cir. 1991) (distinguishing Reynolds because of "abundant evidence" criminal defendant used affirmative misrepresentations). "To prove a scheme to defraud, the government must show fraudulent activity…Activity is only fraudulent if defendants made a misrepresentation of material fact." United States v. Radley, 659 F.Supp.2d 803 (S.D. Tex. 2009) (absence of allegations of

misrepresentation, in the face of the use of purely legal means, requires dismissal) *aff'd* 632 F.3d 177 (5th Cir. 2011).

It is extraordinarily hard to make a material misrepresentation, except by affirmative means. Indeed other courts looking at the have stressed with great emphasis that "we do not imply that all or even most instances of non-disclosure of information that someone might find relevant come within the purview of the mail and wire fraud statutes." United States v. Weimert, 819 F.3d 351, 357 (7th Cir. 2016) (quotation marks removed) *quoting* United States v. Keplinger, 776 F.2d 678, 697-698 (7th Cir. 1985). "Moreover, nondisclosure of an intent not to perform a contract generally cannot be used to bootstrap a fraud claim, since the mail and wire fraud statutes only proscribe representations designed to defraud." In Re: Managed Care Litigation, 298 F.Supp.2d 1259, 1277 (S.D. Fla. 2003).

In sum, where the Defendant was eligible under other categories, and one of his proffered eligibility reasons (a childcare one) was true and unrebutted, any misrepresentation is immaterial. It could not have influenced the DUA decision makers.

> A misrepresentation is material if it has "a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed." Neder v. United States, 527 U.S. 1, 16, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999) (quoting United States v. Gaudin, 515 U.S. 506, 509, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995)); see United States ex rel. Winkelman v. CVS Caremark Corp., 827 F.3d 201, 211 (1st Cir. 2016) (stating that fundamental inquiry of materiality focuses "on whether a piece of information is sufficiently important to influence the behavior of the recipient"). In ascertaining whether any individual misrepresentation is material, several non-dispositive factors are relevant. See United States ex rel. Escobar, 579 U.S. at 194-95, 136 S.Ct. 1989; see also Guilfoile v. Shields, 913 F.3d 178, 187 (1st Cir. 2019) ("Whether an express or implied false representation of compliance with statutes or regulations is `material' is ordinarily `a fact-intensive and context-specific inquiry.'" (quoting New York v. Amgen Inc., 652 F.3d 103, 111 (1st Cir. 2011))). These factors include whether the government expressly identified compliance

> with a particular provision as a condition of payment, see United States ex rel. Escobar, 579 U.S. at 194, 136 S.Ct. 1989, whether the government paid "a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position," id. at 195, 136 S.Ct. 1989, and whether the noncompliance in question goes to "the very essence of the bargain," id. at 193 n.5, 136 S.Ct. 1989, or is merely "minor or insubstantial," id. at 194, 186 S.Ct. 1989.

United States ex rel. Zotos v. Town of Hingham, 98 F.4th 339, 344 (1st Cir. 2024) (finding that alleged misrepresentations were immaterial where they would not have caused the government to deny payment on road contracts).

## V. The Defendant was denied a fair-trial by a jury representative of a cross-section of the community

The Defendant, before jury empanelment, made objection that the jury venire would not be representative. *Day 1 Transcript*, at 6 ("And the second argument we're going to make, this is a little -- this is sort of more advisory, is that we anticipate that the jury pool will not adequately reflect a racial cross-section of Mr. Tran's background, so we ask the Court to take notice of that and, we'll be watching that as we seat the jurors."). The Court overruled the objection. *Id.* at 7-8 (Court carefully describing at length how jurors are drawn from the community).

Thereafter, the Court sat an all-White jury. This would not be solely the fault of the venire process, for the venire did in fact have minorities in it. The for-cause examination excluded a large number of the minority members of the venire, many of them having connections to law enforcement or experiences with the criminal justice system. However, thereafter the Government proceeded to use its peremptory challenges to excuse remaining minority members of the venire

who made it into the jury box.[6] The Government excused, by peremptory challenge, Jurors #6, #23, #36, #44, and #45.

Denial of a racially representative jury is a facial denial of a right to a fair trial. Batson v. Kentucky, 476 U.S. 79, 85 (1986) ("The Equal Protection Clause guarantees the defendant that the State will not exclude members of his race from the jury venire on account of race…"); Taylor v. Louisiana, 419 U.S. 522, 530 (1975) ("Trial by jury presupposes a jury drawn from a pool broadly representative of the community as well as impartial in a specific case…"); Id., at 528 ("The unmistakable import of this Court's opinions, at least since 1940…and not repudiated by intervening decisions, is that the selection of a petit jury from a representative cross section of the community is an essential component of the Sixth Amendment right to a jury trial."); Id. at 530 ("We accept the fair-cross-section requirement as fundamental to the jury trial guaranteed by the Sixth Amendment and are convinced that the requirement has solid foundation. The purpose of a jury is to guard against the exercise of arbitrary power—to make available the commonsense judgment of the community as a hedge against the overzealous or mistaken prosecutor…").

Respectfully Submitted,

Dean Tran
By His Attorney
/S/ Michael Walsh
Michael Walsh
BBO 681001
Walsh & Walsh LLP
PO Box 9
Lynnfield, MA 01940
617-257-5496
Walsh.lynnfield@gmail.com

**Certificate of Service**
I, Michael Walsh certify that this motion was served through the Court's ECF/CM system on this 25th day of September, 2024. /S/ Michael Walsh

[6] One of the minority members excused was Ms. Figuereo who was excused by the Court on a confluence of factors, including an concerns about a language barrier and employment issues. The Defense consented to her excusal.