## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **UNITED STATES of AMERICA** ) | |
| ) | |
| ) | **Criminal No.** |
| **v.** ) | **23-10299-FDS** |
| ) | |
| **DEAN A. TRAN,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

### MEMORANDUM AND ORDER ON DEFENDANT'S MOTIONS
### FOR A JUDGMENT OF ACQUITTAL, NEW TRIAL, AND ARREST OF JUDGMENT

**SAYLOR, C.J.**

In September 2024, after a seven-day trial, defendant Dean Tran was convicted by a jury of 20 counts of wire fraud in violation of 18 U.S.C. § 1343 and three counts of filing false tax returns in violation of 26 U.S.C. § 7206(1). Sentencing is currently scheduled for January 3, 2025.

Two weeks after the jury's verdict, defendant moved for a judgment of acquittal under Fed. R. Crim. P. 29(c). One day later, he filed a motion to arrest judgment under Fed. R. Crim. P. 34 and a motion for a new trial under Fed. R. Crim. P. 33(a). In support of his motions, he challenges certain jury instructions given by the court; the court's failure to give other instructions; the sufficiency of the evidence; the racial composition of the jury; rulings concerning actual and potential witnesses; and the constitutionality of the charges brought against him. For the reasons set forth below, the motions will be denied.

## I. Background

### A. Factual Background

The following is a brief summary of the evidence presented at trial.

1.    **Wire Fraud**

Dean Tran was a Massachusetts State Senator who lost his bid for re-election in November 2020.  After the conclusion of his term in early 2021, he filed for unemployment benefits.  His application was denied on March 12, 2021, because he was not eligible, as a former State Senator, for such benefits under Massachusetts law.

Two days later, on March 14, 2021, Tran accepted a consulting position at an automotive parts company in Nashua, New Hampshire, called 1A Auto.  He signed a consulting agreement with 1A Auto on March 16, 2021, providing that he would be paid $90 per hour for his services. The original contract term lasted until June 16, 2021, but was later extended to September 17, 2021.  Tran began submitting invoices to 1A Auto on April 4, 2021, covering work beginning on March 20, 2021, and began receiving payment for his services on April 22, 2021.  He continued to receive income from his consulting work until September 16, 2021.

On March 15, 2021, Tran applied for Pandemic Unemployment Assistance ("PUA"), a federal program instituted in response to the COVID-19 pandemic and administered by the Massachusetts Division of Unemployment Assistance ("DUA").  He claimed to be eligible for those benefits on the basis that "a child or other person in my household for which I am the primary caregiver is unable to attend school or another facility that is closed as a direct result of the COVID-19 public health emergency and such school or facility care is required for me to work."

On March 16, 2021—the same day that he signed the consulting agreement with 1A Auto—his application for PUA benefits was approved.  He was also notified that he would be required to submit weekly certifications of his continuing eligibility.  Between March 31, 2021, and September 9, 2021, he submitted weekly certifications to DUA in which he claimed not to have worked or earned income in the preceding week.  In fact, he was working for and earning

income from 1A Auto for that entire period.[1]

As evidence that the scheme to defraud involved an interstate wire communication, Jennifer Lavin, a program coordinator at DUA, and Lucas Bremseth, an employee of the contractor that provides DUA with data storage and processing services, testified that the weekly certifications for the PUA program were processed on servers in Colorado.

### 2.    Filing False Tax Returns

Tran owns rental property, consisting of two units, in Fitchburg, Massachusetts.  In the years 2020, 2021, and 2022 he underreported his rental income on this property by approximately half, apparently reflecting the income from only one of the two units.  In addition, for the year 2021, he did not report the $54,270 in income he received from his consulting work for 1A Auto.

### B.    Procedural History

Defendant was indicted on November 16, 2023, on 25 counts of wire fraud in violation of 18 U.S.C. § 1343 and three counts of filing a false tax return in violation of 26 U.S.C. § 7206(1). The matter was tried to a jury beginning on September 3, 2024, and ending on September 10, 2024.  The jury then returned a verdict finding defendant guilty of 20 counts of wire fraud and three counts of filing a false tax return.  A sentencing date has been set for January 3, 2025.

On September 25, 2024, defendant filed a motion for judgment of acquittal under Fed. R. Crim. P. 29(c), and the next day filed motions for a new trial under Fed. R. Crim. P. 33(a) and for arrest of judgment under Fed. R. Crim. P. 34(a).

---

[1] On April 9, 2021, DUA notified Tran that it would be suspending his PUA benefits.  He appealed the suspension.  During a hearing with DUA, he failed to disclose his employment with 1A Auto.  He also submitted a document purporting to be an employment offer letter from a different company.  Following the hearing, on June 9, 2021, DUA reinstated his eligibility, both retroactively and going forward, and he continued to submit weekly certifications indicating that he was not working and not earning money.  The government offered evidence showing that the purported offer letter was in fact created by Tran and his sister solely for the purpose of obtaining benefits.

II.    **Standard of Review**

A judgment of acquittal should only be granted when the evidence, including any

reasonable inferences from the evidence, viewed in the light most favorable to the verdict, are

insufficient for a rational factfinder to conclude beyond a reasonable doubt that the defendant

committed each element of the charged offense. *United States v. Pimental*, 380 F.3d 575, 584

(1st Cir. 2004). The court must consider all evidence, both direct and circumstantial, and

resolves all evidentiary conflicts in favor of the verdict. *Id.* However, the court may not assess

the credibility of the witnesses, as that is "a role reserved for the jury." *United States v. Rivera-*

*Rodriguez*, 617 F.3d 581, 596 (1st Cir. 2010) (quoting *United States v. Troy*, 583 F.3d 20, 24 (1st

Cir. 2009)). Nor does the court need to be convinced that "the government succeeded in

eliminating every possible theory consistent with the defendant's innocence." *Id.*

This standard is a "formidable" one, and poses an "uphill battle" to defendants

challenging convictions on insufficient evidence grounds. *United States v. Lipscomb*, 539 F.3d

32, 40 (1st Cir. 2008). Nevertheless, "despite the prosecution-friendly overtones of the standard

of review, [review] of sufficiency challenges is not an empty ritual." *United States v. de la*

*Cruz–Paulino*, 61 F.3d 986, 999 n.11 (1st Cir. 1995) (citation and quotation marks omitted).

Under Rule 33(a), "the court may vacate any judgment and grant a new trial if the interest

of justice so requires." Fed. R. Crim. P. 33(a). Motions for a new trial are directed to the

discretion of the court, which "may 'weigh the evidence and evaluate the credibility of

witnesses, . . . [but] the remedy of a new trial is sparingly used, and then only where there would

be a miscarriage of justice and where the evidence preponderates heavily against the verdict.'"

*United States v. Merlino*, 592 F.3d 22, 32 (1st Cir. 2010) (quoting *United States v. Wilkerson*,

251 F.3d 273, 278 (1st Cir. 2001)). To obtain a new trial under Rule 33(a), a defendant must

show that he was "denied a fair trial" in a way that "likely affected the trial's outcome." *United*

*States v. Casas*, 425 F.3d 23, 38-39 (1st Cir. 2005).

Under Rule 34(a), "upon the defendant's motion . . . , the court must arrest judgment if the court does not have jurisdiction of the charged offense."  Fed R. Crim. P. 34(a).  The court may arrest judgment "only on the basis of error appearing on the 'face of the record,' and not on the basis of proof offered at trial."  *United States v. Sisson*, 399 U.S. 267, 281 (1970).  That is, the court may base its ruling only upon "the indictment, the plea, the verdict[,] and the sentence." *People of Territory of Guam v. Palomo*, 511 F.2d 255, 259 (9th Cir. 1975).

**III.    Analysis**

    **A.    Motion for a Judgment of Acquittal**

The motion for a judgment of acquittal is based on four separate contentions:  (1) that the court erroneously gave an *Allen* charge to the jury; (2) that the court erred in its formulation of a reasonable-doubt instruction; (3) that the government failed to introduce sufficient evidence of wire fraud; and (4) that the jury was not representative of a cross-section of the community.

        **1.    *Allen* Charge**

Defendant first contends that the court's *Allen* charge to the jury was given in error—specifically, that the instruction was given too early and was not warranted by the particular phrasing of the jury's question.[2]

After eight hours of deliberation over two days, the jury asked the following question: "If the jury cannot reach agreement on some but not all counts, what will the outcome of the trial be?"  (Trial Ex. G).

The court concluded that there were two likely aspects to that question—first, an inquiry

---

[2] "In *Allen*, the Supreme Court approved of supplemental instructions given to a deadlocked jury urging them to continue deliberating and for the jurors in the minority to listen to the majority's arguments and ask themselves whether their own views were reasonable under the circumstances."  *Spears v. Greiner*, 459 F.3d 200, 204-05 (2d Cir. 2006) (citing *Allen v. United States*, 164 U.S. 492, 501 (1896)).

as to the practical effect of failing to reach agreement, and second, a clear indication that the jury was in fact at an impasse as to some, but not all, counts.  In order to address both aspects of the question, the court provided an answer to the "practical effect" question and gave a modified *Allen* charge.  It then instructed the jury to resume its deliberations.

"The danger of an *Allen* charge is that jurors who hold a minority opinion will feel that the judge is putting pressure on them to surrender their viewpoint." *United States v. Barone*, 114 F.3d 1284, 1304 (1st Cir. 1997).  In order to mitigate that potentially prejudicial effect, the First Circuit has required district courts to include the following elements in any such supplementary instruction:  "that (1) members of both the majority and the minority should reexamine their positions, (2) a jury has the right to fail to agree, and (3) the burden of proving guilt beyond a reasonable doubt remains with the government." *United States v. Manning*, 79 F.3d 212, 222 (1st Cir. 1996) (citing *United States v. Angiulo*, 485 F.2d 37, 39 (1st Cir. 1973)).  The modified *Allen* charge set forth in the First Circuit Pattern Criminal Jury Instructions contains all of those safeguards and was approved by the First Circuit in *United States v. Nichols*.  820 F.2d 508, 511-12 (1st Cir. 1987); Pattern Criminal Jury Instructions for the District Courts of the First Circuit § 6.06 cmt. 1.[3]

Here, the *Allen* charge followed that model nearly verbatim.  In addition, the court's response to the question further emphasized that the jury was not obligated to reach agreement, stating from the outset that "as to any particular count, you can vote to acquit or convict as you see fit, or you may not reach agreement."  (Trial Day 7 Transcript, at 6).

Defendant contends that because the jury's question was phrased as a hypothetical, the

---

[3] Defendant also argues that the *Allen* charge is unconstitutional, citing Third Circuit case law in support. *See United States v. Fioravanti*, 412 F.2d 407, 417 (3d Cir. 1969).  There is no such case law in this circuit, however, and the court declines to follow *Fioravanti*.

indication of deadlock was not sufficiently definitive to warrant an *Allen* charge.  In support of

that contention, he relies substantially on a misreading of *Manning*.  The *Manning* court held that

when a jury poses a question indicating deadlock, it is improper for the court to provide an

indirect answer that might imply an obligation to reach a verdict.  *Manning*, 79 F. 3d at 222-23.

That decision says nothing about the propriety of giving an *Allen* charge in response to a

hypothetical question.

      Furthermore, the timing of the court's delivery of the charge was well within reasonable

bounds.  "[T]he timing of an *Allen* charge is left to the district court's sound discretion . . . , and

is not subject to any fixed time constraints."  *United States v. Vanvliet*, 542 F.3d 259, 269 (1st

Cir. 2008).  And giving the charge after eight hours of deliberation over two days is consistent

with past practice in this Circuit.  *See, e.g.*, *id.* (six hours); *United States v. Nichols*, 820 F.2d

508, 512 (1st Cir. 1987) (nine hours); *United States v. Rengifo*, 789 F.2d 975, 978 (1st Cir. 1986)

(seven hours); *see also United States v. Sawyers*, 902 F.2d 1217, 1220 (6th Cir. 1990)

("[C]ontrary to what defendant claims, an *Allen* charge coming relatively early is arguably less

coercive than one coming after a jury has worn itself out after several days of deadlocked

deliberations.").

      Finally, even assuming that the *Allen* charge was given in error, there were no elements

of possible coercion that would suggest it was prejudicial to a degree that would warrant relief.

Contrary to defendant's contention, the period of an hour and a half of deliberation between the

charge and the verdict does not indicate coercion.  *See United States v. Hernandez-Albino*, 177

F.3d 33, 38 (1st Cir. 1999) (finding one hour of post-*Allen*-charge deliberation not indicative of

coercion); *Green v. French*, 143 F.3d 865, 886 (4th Cir. 1998) (same); *Vanvliet*, 542 F.3d at 270

(same, for two hours); *United States v. Hernandez*, 105 F.3d 1330, 1334 (9th Cir. 1997) (same,

for 40 minutes); *United States v. Smith*, 635 F.2d 716, 721-22 (8th Cir. 1980) (same, for 45 minutes).  And the fact that the jury ultimately rendered no verdict on five counts strongly suggests that the court's communication with the jury did not leave them with the impression that they were required to reach a verdict or deliberate indefinitely.

Accordingly, the *Allen* charge was not given in error and was not otherwise improper, and therefore cannot support a motion to acquit.

### 2.    <u>Reasonable Doubt Instruction</u>

Defendant next challenges the court's reasonable-doubt instruction.  Where a trial court chooses to define reasonable doubt, "the Constitution does not require . . . any particular form of words," *Victor v. Nebraska*, 511 U.S. 1, 5 (1994), subject to the limitation that its definition may not create "a reasonable likelihood of leading the jury to believe that it can convict on some lesser standard of proof."  *United States v. Van Anh*, 523 F.3d 43, 57 (1st Cir. 2008).

The instruction here did not create any such likelihood.  For the most part, the instruction followed the First Circuit's model, approved in *Van Anh,* 523 F.3d at 58-59, and *United States v. Jones*, 674 F.3d 88, 93 (1st Cir. 2012).  To the extent the instruction elaborated beyond the model, it described levels of uncertainty that would not warrant conviction.  Defendant incorrectly contends that this was improper.  *See Van Anh*, 523 F.3d at 57-58 (rejecting challenge to reasonable doubt definition using "negative terms"); *see also United States v. Whiting*, 28 F.3d 1296, 1304 (1st Cir. 1994) (upholding an instruction "that with a few general phrases indicates that not every doubt is a reasonable one").

Defendant complains that his preferred instruction, from *Commonwealth v. Webster,* 5 Cush. 295 (Mass. 1850) was not used, but "the trial court's charge to the jury need not follow the exact form and wording of the defendant's proposed instructions," *United States v. Gibson*, 726 F.2d 869, 874 (1st Cir. 1984).  Furthermore, this court is not bound by Massachusetts state-court

practice.  The essential contents of the instruction provided have been upheld numerous times, and there is no reason to believe that it was unfairly prejudicial.

### 3.    **Evidence of Wire Fraud**

Defendant next contends that insufficient evidence was presented on the foreseeability of the relevant wire communications crossing state lines.  Such "foreseeability" evidence was not required for conviction.  "The wire-fraud statute's interstate-nexus requirement is purely jurisdictional and not a substantive element of the offense, meaning that the government did not have to prove that [defendant] had reason to think that a communication would cross state lines." *United States v. Tum*, 707 F.3d 68, 73 (1st Cir. 2013).

Defendant further contends that his misrepresentations were not material, because he may have qualified for benefits under other criteria or may have been eligible regardless of his misrepresentations.  That is irrelevant.  Whether the victim actually suffered loss because of the misrepresentation is not an element of the crime of wire fraud and not an aspect of materiality. "[T]o establish materiality, the government need not prove that the decisionmaker actually relied on the falsehood . . . .  Instead, the government need only show that the false statement had a natural tendency to influence, or was capable of influencing its target's decision." *United States v. Correia*, 55 F.4th 12, 27-28 (1st Cir. 2022) (cleaned up).  Defendant's misrepresentations concerning his employment and income would clearly have a natural tendency to influence DUA's decision whether to provide unemployment assistance and are therefore material.

Finally, defendant contends that his misrepresentations were "mere omissions" that cannot support a wire-fraud charge.  That is incorrect as a factual matter; each wire-fraud count is based on an affirmative submission by defendant, falsely certifying that he had not worked or earned income.  And even if defendant had not made those affirmative misrepresentations, it is well-established that under the wire-fraud statute, "the concept of a misrepresentation is . . .

broad, reaching not only false statements of fact but also . . . the omission or concealment of material information, even absent an affirmative duty to disclose, if the omission was intended to induce a false belief and action to the advantage of the schemer . . . ." *United States v. Weimert*, 819 F.3d 351, 355 (7th Cir. 2016).

Sufficient evidence was adduced at trial for a reasonable jury to conclude that defendant intentionally made material misrepresentations to DUA and, in so doing, committed wire fraud.

### 4.    Jury Representativeness

Defendant's challenge to the racial composition of the jury is entirely without a factual basis. On the morning of empanelment, defendant made an "advisory" objection in "anticipat[ion] that the jury pool will not adequately reflect a racial cross-section of [his] background." (Trial Day 1 Transcript at 6).[4] He offered no evidence in support of that objection, which was entirely conjectural. The court overruled the objection for reasons stated on the record. (*Id.* at 7-9). Defendant now raises a new challenge—not to the composition of the pool, but instead to the composition of the jury itself. In substance, he is attempting to make an untimely *Batson* challenge to the exercise of peremptory challenges by the government. *See Batson v. Kentucky*, 476 U.S. 79, 85-88, 93-100 (1986).

First, no such objection was raised during empanelment, at a time when the court would have had an opportunity to address it. It has therefore not been preserved. *United States v. Charlton*, 600 F.3d 43, 50 (1st Cir. 2010).

In any event, defendant has failed to "make a prima facie showing of discrimination in the prosecutor's launching of [any] strike." *United States v. Girouard*, 521 F.3d 110, 113 (1st Cir. 2008). He does not point to any particular challenge, or provide any factual basis that would

---

[4] Tran is Vietnamese-American.

even begin to suggest racial animus in any peremptory challenge.  And it appears that the government used its peremptories almost exclusively on potential jurors who are white; it contends that "the only person of color" as to whom it exercised a challenge was challenged on the basis of his claiming to have been wrongfully arrested, convicted, and sentenced and thus having "mixed feelings" about law enforcement.  (Gov't Mem. at 9-10).[5]

When reviewing an unpreserved *Batson* claim, "[u]nless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral."  *United States v. Pulgarin*, 955 F.2d 1, 2 (1st Cir. 1992).  Under the circumstances, not only has defendant failed to make out a *prima facie* case, but also has failed to show that the prosecution did not provide a satisfactory explanation for the exercise of any challenge.

### B.    Motion for New Trial

Defendant raises five alleged grounds to support his motion for new trial:  (1) the court's refusal to permit his last-minute expert witness to testify; (2) the court's refusal to require government witnesses to qualify as experts; (3) the court's refusal to give a missing-witness instruction; (4) the government's indictment of defendant's sister; and (5) defendant's being called to testify earlier than expected.  Those grounds, independently and taken as a whole, fail to warrant a new trial.

First, defendant's purported expert witness was not permitted to testify because he had not been properly identified prior to trial, and his opinions—including their factual and methodological bases—had not been disclosed in accordance with the relevant legal requirements.

---

[5] Among the many problems of asserting a *Batson* challenge long after the fact is the difficulty it poses in reconstructing the relevant events.  It appears from the court's notes that the potential juror in question was African-American.  It also appears that defendant himself struck potential jurors who were African-American or Hispanic.

Second, the court did not require the government's witnesses to qualify as "experts" under Rule 702, because it was unnecessary to do so; the witnesses provided testimony as either summary or percipient witnesses.

Third, neither the unavailability of defendant's sister nor his expert fell within the narrow circumstances that would warrant a missing-witness instruction.[6]  His sister did not testify because she participated in the scheme, is under indictment for having done so, and claimed her Fifth Amendment right not to testify.  The government refused to seek immunity for her to permit her to testify.  That is not a proper basis for a missing-witness instruction; "the government's failure to immunize a witness, without more, does not give rise to a missing witness instruction."  *United States v. St. Michael's Credit Union*, 880 F.2d 579, 598 (1st Cir. 1989).  As to the expert, defendant requests what is essentially the inverse of a normal missing-witness instruction—that is, an instruction *against* making any adverse inference, in contrast to an instruction that *allows* the jury to make such an inference.  Defendant provides no basis, and points to no precedent, for such an instruction.

Fourth, defendant set forth a litany of unsubstantiated and speculative accusations against the United States Attorney's Office to the effect that the indictment of his sister was a deliberate and improper form of witness tampering.  The court will not grant a new trial on that basis.

---

[6] The First Circuit has established only three circumstances that may warrant a missing witness instruction:

"[T]he jury may draw an inference adverse to a party toward whom the missing witness is 'favorably disposed,' because the party would normally be expected to produce such a witness.  In addition, the jury may draw an adverse inference when a party fails to produce a material witness who is peculiarly available to that party.  [Finally], when a party having *exclusive* control over a witness who could provide relevant, noncumulative testimony fails to produce the witness, it is permissible to draw an adverse inference from that party's failure to do so, even in the absence of any showing of the witness's predisposition toward the party."

*St. Michael's Credit Union*, 880 F.2d at 597 (quoting *United States v. Ariza-Ibarra*, 651 F.2d 2, 16 (1st Cir. 1981)) (emphasis in original) (internal citations omitted).

Fifth, the fact that defendant testified earlier than he anticipated did not violate his constitutional right to present a defense. He cites no case law nor any part of the record in support of his position. He claims that the timing of his testimony prevented him from using certain charts, but no objection was made on that basis at trial. Indeed, the court did not actually exclude any such evidence—he only objects now, after the fact, on the basis that he was unprepared. A defendant certainly has a right to put on a defense, but that does not entail an unfettered power to dictate the sequence of testimony or the trial's procedure. *See Geders v. United States*, 425 U.S. 80, 86 (1976) ("[In a criminal trial, the judge] must have broad power to cope with the complexities and contingencies inherent in the adversary process. To this end, he may determine generally the order in which parties will adduce proof."); *Harris v. Barkley*, 202 F.3d 169, 173-74 (2d Cir. 2000) (finding no violation of defendant's rights in "ruling that [defendant] had to testify (if he chose to testify at all) before a non-party witness whose appearance was delayed").

Ultimately, "the remedy of a new trial is sparingly used, and then only where there would be a miscarriage of justice and where the evidence preponderates heavily against the verdict." *Merlino*, 592 F.3d at 32. Instead of protecting against any miscarriage of justice, to grant a new trial here would, in large part, validate complaints against the very "rules of procedure and evidence [that are] designed to assure both fairness and reliability," and with which "the accused . . . must comply." *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973). Accordingly, defendant's motion for a new trial will be denied.

## C.    <u>Motion to Arrest Judgment</u>

Finally, defendant has moved to arrest judgment on the ground that the court "does not have jurisdiction of the charged offense." Fed. R. Crim. P. 34(a).

He first argues that the Tenth Amendment bars the wire-fraud prosecution in this case.

The court has already rejected that argument. (ECF Nos. 35, 42). Again, the interstate wire-transmission requirement gives rise to federal jurisdiction even if the victim is a government and even if the victim is located in the same state as the perpetrator. *See United States v. McLellan*, 959 F.3d 442, 469 (1st Cir. 2020); *United States v. Gordon*, 875 F.3d 26, 37 (1st Cir. 2017); *Tum*, 707 F.3d at 73; *United States v. Morris*, 572 F. Supp. 2d 323, 339-40 (E.D. Ky. 2021).

Defendant next contends, based on an imaginative reading of the Sixteenth Amendment, that it is unconstitutional for a person to be found guilty of filing a false tax return if there is no proof of pecuniary loss to the government. It does not appear that any court has seriously questioned the constitutionality of the false tax-return statute, and this court declines to be the first. And, in any case, a statute forbidding the submission of knowingly false statements in federal tax returns is, at the very least, rationally related to the legitimate government interest in administering the tax system, even if applied to a perpetrator who did not cause the government any pecuniary loss.[7]

## IV.    Conclusion

For the foregoing reasons, defendant's motion to acquit, motion for a new trial, and motion to arrest judgment are all DENIED.

**So Ordered.**

/s/  F. Dennis Saylor IV
F. Dennis Saylor IV
Chief Judge, United States District Court

Dated:  December 16, 2024

---

[7] Furthermore, to the extent defendant's argument on this point relies upon evidence beyond "the indictment, the plea, the verdict[,] and the sentence," it cannot form the basis for an arrest of judgment under Rule 34(a). *Palomo*, 511 F.2d at 259; *see Sisson*, 399 U.S. at 281.