UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Docket No. 23-CR-10299-FDS |
| | ) | |
| DEAN A. TRAN, | ) | |
| | ) | |
| Defendant. | ) | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

Dean TRAN was convicted of engaging in a wire fraud scheme for stealing COVID-19 unemployment assistance benefits at the very same time he worked as a consultant for an automotive parts company earning $90.00 per hour. TRAN also willfully and repeatedly cheated on his 2020, 2021 and 2022 taxes. TRAN has shown no remorse for his crimes or accepted responsibility for his actions. Instead, he has attempted to obstruct justice, cast blame elsewhere and made baseless accusations that have absolutely no support in law or fact. For these reasons, TRAN is deserving of a sentence of 24 months in prison that will hold him responsible and punish him for his fraud, deceit and lies.

TRAN stole unemployment benefits from a program that was intended for the most vulnerable members of our community, who, unlike TRAN were suffering true economic hardship during the COVID-19 Pandemic. TRAN, as a former elected official, knew better than anyone else the importance and purpose of such government assistance programs and he exploited his unique knowledge and background for his own selfish motives. TRAN's tax fraud involved concealing income he earned on a rental property that he owned. TRAN's tax fraud involved an investment property that provided him with lucrative, supplemental income. Greed was at the center of TRAN's crimes as he callously broke the law to gain some advantage for

himself.  His crimes are especially troubling because as a public official he was called to serve government, not to have it serve him in furtherance of his fraud schemes.

TRAN defrauded the unemployment system and the IRS.  But TRAN's deceit and lies did not end with only his initial unemployment claims and tax returns. When his unemployment benefits were halted, he did not stop what he was doing, but instead recommitted himself to fraud.  He orchestrated a sham employment letter with his sister; he submitted false documents to unemployment officials; and then lied under oath to an unemployment hearings officer.  When agents confronted TRAN at his residence, he lied to them and then TRAN took the stand at trial and lied to the jury.   And unlike other defendants appear before the Court, there are no mitigating conditions to explain TRAN's criminal conduct.  His crimes were not motivated by legitimate financial distress, a momentary lapse of judgment or him not understanding what he was doing.  TRAN was a successful businessman with an excellent education and supportive family.  Based on all of the circumstances of this case, including TRAN's personal background and history, a sentence of 24 months is just and appropriate.

TRAN was convicted after a seven-day jury trial of 20 counts of wire fraud, in violation of 18 U.S.C. § 1343 (Counts 6-25) and three counts of filing a false and fraudulent tax return, in violation of 26 U.S.C. § 7206(1) (Counts 26-28).  Presentence Investigation Report ("PSR"), ¶ 3. The jury did not reach a verdict as to Counts 1-5 charging wire fraud and those counts were dismissed on September 20, 2024.

### TRAN'S CRIMINAL CONDUCT

TRAN is a former Massachusetts State Senator who served from December 2017 to January 2021.  PSR, ¶ 9.  TRAN lost re-election in 2020 after a state ethics investigation revealed that he had violated ethics rules.  PSR, ¶ 9.

**A. TRAN Fraudulently Obtained Unemployment Benefits While Earning Income As A Consultant**

After TRAN lost re-election, he was unemployed. He initially applied for traditional unemployment benefits, *See* Trial Exhibit ("Exhibit") 1; PSR, ¶ 10. On March 12, 2021, the Massachusetts Department of Unemployment Assistance ("DUA") denied TRAN's unemployment claim because he was ineligible for traditional unemployment benefits as a former elected official. *See* Exhibit 3; PSR, ¶ 10. Three days later, on March 15, 2021, TRAN applied for Pandemic Unemployment Assistance ("PUA"). *See* Exhibit 5, PSR, ¶ 11. In his application, TRAN claimed that he needed PUA benefits because "[a] child or other person in my household for which I am the primary caregiver is unable to attend school or another facility that is closed as a direct result of the COVID-19 public health emergency and such school or facility care is required for me to work." *See* Exhibit 5; PSR, ¶ 11. On March 16, 2021, TRAN was approved for PUA benefits. *See* Exhibit 7; PSR, ¶ 11.

TRAN's application for PUA benefits was materially false and fraudulent because he in fact had accepted a consulting position on March 14, 2021 to work for a New Hampshire-based 1A Auto Parts, Inc. (the "Automotive Parts Company" or "1A Auto"). *See* Exhibit 28; PSR, ¶ 12. Two days later, on March 16, 2021, TRAN signed a consulting agreement whereby he was to be paid $90 per hour as a consultant. *See* Exhibit 30; PSR, ¶ 12. The term of the Consulting Agreement was initially three months (until June 16, 2021), but TRAN and 1A Auto subsequently agreed to extend the consulting arrangement to September 17, 2021. PSR, ¶ 12.

Upon DUA approving TRAN's PUA benefits, he was required to certify on a weekly basis his continued eligibility for the PUA program, in order to receive benefits. *See* Exhibit 7; PSR, ¶ 14. These weekly certifications required the certification that all income that TRAN earned in that week was reported, and that his inability to work remained constrained due to the

3

COVID-19 Pandemic.  PSR, ¶ 14.  Between March 15, 2021, and April 11, 2021, TRAN

certified that he could not work because he was required to care for his children.[1]  *See* Exhibit

24; PSR, ¶ 14.   Between April 18, 2021, and September 15, 2021 (when benefits ended), TRAN

certified that childcare prevented him from working and also checked a box stating, "I was

scheduled to commence employment and do not have a job or am unable to reach the job as a

direct result of the COVID-19 public health emergency."  *See* Exhibit 24; PSR, ¶ 14.

TRAN committed wire fraud in claiming and receiving unemployment benefits at the

same time that he worked as a consultant for 1A Auto. TRAN regularly emailed invoices to 1A

Auto for his consulting services that 1A Auto paid by paper check to TRAN.  *See* Exhibit 31;

PSR, ¶ 15.  TRAN deposited the consulting checks into his Rollstone Bank checking account

that he shared with his wife, K.T.  *See* Exhibit 32; PSR, ¶ 15.   From March 2021 through

September 2021, TRAN received $50,805 in income from 1A Auto, as illustrated below.  *See*

Exhibit 116; PSR, ¶ 15.

| Month (2021) | 1A Auto |
|---|---|
| March | n/a |
| April | n/a |
| May | $18,045 |
| June | $8,820 |
| July | $5,040 |
| August | $13,365 |
| September | $5,535 |
| **Total** | **$50,805** |

---

[1] The exact language of the box that TRAN checked provided, "*A child or other person in my household for which I am the primary caregiver is unable to attend school or another facility that is closed as a direct result of the COVID-19 public health emergency and such school or facility care is required for me to work.*"  *See* Exhibit 24.  To be clear, the jury did not reach a verdict as to the weekly certifications for March 21, 2021 through April 18, 2021 that were the basis for Counts 1-5.

TRAN's false certifications resulted in him receiving approximately $43,295 in PUA benefits by committing fraud, as illustrated below.  *See* PSR, ¶ 17.

| Month (2021) | PUA |
|---|---|
| March | $15,060 |
| April | $1,255 |
| May | n/a |
| June | $15,060 |
| July | $5,020 |
| August | $5,020 |
| September | $2,510 |
| **Total** | **$43,925** |

TRAN falsely and fraudulently obtained these PUA benefits because (a) he claimed to not be working on the weekly certifications, but he was in fact working for the Automotive Parts Company; (b) he claimed to not be earning income on the relevant weekly certifications, but the Automotive Parts Company had started making payments to him starting as early as April 22, 2021; and (c) he claimed that COVID-19 prevented him from working, but he was working for the Automotive Parts Company as early as March 20, 2021. *See* Exhibit 131; PSR, ¶ 17.

**B. TRAN Compounded His Fraud Scheme Through Lies In DUA Appeals Proceedings**

On April 9, 2021, the DUA issued TRAN a "Notice of Non-Monetary Issue Determination due to Employment Substantiation," which terminated TRAN's PUA benefits after April 7, 2021 and invalidated his unemployment claim.  *See* Exhibit 13; PSR ¶ 18.  Three days later, on April 12, 2021, TRAN appealed the DUA's ineligibility determination. *See* Exhibit 17; PSR ¶ 19.   As part of his appeal claim, TRAN submitted an appeal letter and a fraudulent employment offer letter to the DUA.  *See* Exhibit 18; PSR ¶ 19.  The employment offer was purportedly from Alecon Enterprises, an Asian foods company owned by his sister, Tuyet Martin, ("Martin").  *See* Exhibit 16; PSR ¶ 19.

Several factors reveal the bogus, false nature of the letter.  First, the letter was sent by email from Martin to TRAN on April 16, 2021, even though it was dated months earlier.  *See* Exhibit 62; PSR ¶ 19.  The purported salary of $120,000 was about three times the salary of Martin, who was the head of the company as its owner and CEO.  PSR ¶ 19.  Between 2019 and 2023, Martin never earned more than $45,000 annually.  *See* Exhibit 96; PSR ¶ 19.  Emails showed that TRAN had essentially written the letter for Martin and that its only purpose was to help TRAN convince DUA to reverse its denial of benefits.  *See* Exhibit 62, 64; PSR ¶ 19.

Not only did TRAN submit the bogus letter, but he also submitted a separate letter to DUA that was false.  *See* Exhibit 15.  In this letter TRAN wrote, "On April 12th 2021 I filed an appeal online and has yet receive any notification. My situation has not changed and base [sic] on my situation and the information I have provided, the qualification and my eligibility under the PUA remains the same." *See* Exhibit 15; PSR ¶ 20.  TRAN knew this statement was false because by April 12, 2021, TRAN was able to work and was actively working for the Automotive Parts Company at that time.  PSR ¶ 20.

On May 21, 2021, TRAN participated in a hearing with DUA under oath.  PSR ¶ 21. During this hearing, TRAN again made false statements regarding the job offer from Alecon Enterprises:

- That he applied for the job
- That he submitted his resume to acquaintance
- That he talked to HR.
- That he had "several interviews with Alecon"

Also during the hearing, TRAN intentionally concealed from the hearings officer that (1) his sister, Martin, was the CEO of Alecon; (2) he was working for 1A Auto; and (3) he had exchanged emails regarding the letter with his sister.  *See* Exhibits 22 and 66.

On June 9, 2021, the DUA reversed its earlier decision terminating TRAN's benefits and determined that he was eligible for PUA benefits, "beginning the week ending January 2, 2021, and indefinitely thereafter, if otherwise eligible." *See* Exhibit 20; PSR ¶ 24.   On August 4, 2021, the DUA notified TRAN by letter that PUA benefits were terminating following the week ending September 4, 2021. *See* Exhibit 21; PSR ¶ 25.   TRAN's final PUA payment was on September 9, 2021. *See* Exhibit 103; PSR ¶ 25.

In total, TRAN submitted 25 fraudulent certifications to collect his benefits, $1,255 per week, the maximum amount PUA provides, and at the same time he worked for and earned consulting income from 1A Auto. *See* Exhibit 24; PSR ¶ 26.  The jury found him guilty of charges related to 20 of the false certifications.

### C.  TRAN Willfully Concealed and Omitted Approximately 50% of His Rental Income

TRAN was convicted of three counts of filing false and fraudulent tax returns for concealing about 50% of the rental income he earned from an investment property from the IRS. TRAN also concealed the consulting income from 1A Auto by omitting it from his 2021 tax return.  TRAN purchased the investment property, a two-family residence, 99-101 Harrison Avenue, Fitchburg, Massachusetts (the "Fitchburg Rental Property") in 1999.  PSR ¶ 28.  TRAN collected rental income from tenants that lived in the property's two units. *See* Exhibits 78 and 79; PSR ¶ 28.

TRAN's tenants paid their rent by a variety of means, including personal checks, bank checks/certified checks, and through rental assistance programs. *See* Exhibits 41, 42, and 43, 67.1 and 121; PSR ¶ 30.  The monthly rent of each of TRAN's units was $1,175 in 2020 and increased to $1,300 in 2021, due at the beginning of each month.  TRAN's gross earnings from his rental property amounted to approximately $31,000 annually. *See* Exhibit 113; PSR ¶ 31.

7

In 2020, 2021 and 2022, TRAN and his wife filed joint Form 1040 -- United States Individual Income Tax Returns. *See* Exhibits 46, 47, and 48; PSR ¶ 32.  TRAN additionally filed a Schedule E with his tax returns which included rental income, as well as ordinary and necessary expenses like repairs, supplies, and utilities, among other items.  *See* Exhibits 46, 47, and 48; PSR ¶ 32.  Revenue Agent Colleen Ranahan testified about the checks, money orders and bank checks that she reviewed showing the rental income to TRAN for 2020, 2021 and 2022.  *See* Exhibits 41, 42, and 43 PSR ¶ 32.  In addition, two of TRAN's tenants testified that they had rented units at the Fitchburg Rental Property, and they testified that checks from them to TRAN were rental checks for their units at TRAN's property.  *See* Exhibits 41, 42, and 43, 67.1 and 121; PSR ¶ 32.

Revenue Agent Ranahan explained how the defendant's bank records and the tenants' testimony showed that TRAN was actually making approximately double the amount of rental income between 2020 and 2022 that he reported on his tax returns.  Thus, his tax returns only reported about 50% of the rental income.  On TRAN's 2020 Tax Return, TRAN reported $14,100 in gross rental income. *See* Exhibit 46.  TRAN's bank records show that he actually earned gross rental income of approximately $27,544 in 2020.   *See* Exhibit 67; PSR ¶ 33.  Therefore, TRAN underreported rental income by approximately $13,444 in 2020.  *See* Exhibit 109; PSR ¶ 33.  On TRAN's 2021 Tax Return, TRAN reported $15,600 in gross rental income. *See* Exhibit 47 PSR ¶ 33.   However, in 2021, TRAN actually earned gross rental income of approximately $32,155.  *See* Exhibit 67; PSR ¶ 33.  Therefore, TRAN underreported rental income by approximately $16,555 in 2021. *See* Exhibit 109; PSR ¶ 33.   On TRAN's 2022 Tax Return, TRAN reported $15,600 in gross rental income.  *See* Exhibit 48; PSR ¶ 33.  However, in 2022, TRAN actually earned gross rental income of approximately $31,200.  *See* Exhibit 67;

PSR ¶ 33.    Therefore, TRAN underreported rental income by approximately $15,600 in 2022. *See* Exhibit 109; PSR ¶ 33.

TRAN's 2018 and 2019 tax returns revealed the willful and intentional nature of his tax fraud scheme because for those returns TRAN had reported essentially all his rental income. *See* Exhibits 44 and 45. This illustrates that TRAN's omissions in 2020, 2021 and 2022 amounted to willful concealment and were not the result of some accident or mistake. As more proof of TRAN's willful conduct, while TRAN under-reported about 50% of his reportable rental income on his 2020, 2021 and 2022 returns, he still claimed roughly the full alleged business expenses on each of these tax returns as he had when he did report the full income amounts in 2018 and 2019. *See* Exhibits 44 and 45; PSR ¶ 32.

### D.  TRAN Willfully Concealed and Omitted his 1A Auto Income

TRAN's tax fraud scheme also included his willful concealment and omission of his 1A Auto income from the IRS on his 2021 tax return. Pursuant to TRAN's consulting contract with 1A Auto that TRAN signed, he was "solely responsible for, and will file, on a timely basis, all tax returns required to be filed with, or made to, any federal, state, or local tax authority with respect the performance of services and receipt of fees under [the] Agreement." *See* Exhibit 29, PSR ¶ 36. Despite this consulting agreement and TRAN's knowledge of his tax reporting obligations, TRAN intentionally omitted the $54,720 in consulting checks that he received from 1A Auto between April 22, 2021 and September 23, 2021. *See* Exhibit 116, PSR ¶ 38.

### THE GUIDELINES CALCULATION

The government agrees with the PSR that the total offense level is 15 based on determinative calculations related to TRAN's fraudulent conduct. PSR, ¶¶ 51-76.

## A.  The Obstruction of Justice Enhancement Is Warranted

The government agrees with the Probation Department that the defendant's conduct

qualifies for an obstruction of justice enhancement.[2]  TRAN committed obstruction of justice (1)

by attempting to influence the jury by providing an interview to the *Boston Globe* before the

trial, posting to Facebook during the trial (which was in turn covered by the *Boston Herald*); and

(2) by providing false testimony during the trial.

<u>TRAN Provided False Testimony</u>

TRAN testified under oath that he and the unemployment hearings officer, Debra Lerner,

had an off-the-record conversation PSR ¶ 48.   The defense's opening statement made this

testimony material to the case as he argued that it meant he lacked the intent to defraud:

> Dean actually told the DUA examiner before they went on the record and,
> unfortunately, you're going to take his and her word for this but before they went
> on the record for Dean's hearing to reinstate his benefits, which, by the way, he
> won, he told her that he had contract work and she said it wasn't a problem, it
> wasn't relevant, it wasn't her job, didn't want to know it, and then
> she hopped right into the hearing. . . . Dean didn't try to hide anything.

*See* Trial Day 2, p. 49.

TRAN testified consistent with his attorney's opening statement.  During his direct

examination, when asked, "What, if any, other conversations occurred with Debra Lerner?"

TRAN testified, "She and I had a brief conversation prior to interview… I just gave her a

glimpse of my job search, the number of resumes and cover letters I sent out, as well as looking

at consultancy work."

---

[2]  Under 3C1.1, "[i]f (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense level by 2 levels."

Debra Lerner subsequently testified that she and the defendant did not have any such off-the-record conversation ("absolutely not") and that any such conversation (had it occurred) would have been recorded. *See* Trial Day 5, p. 128; PSR ¶ 48.   This type of testimony falls under the obstruction of justice enhancement as it was material to the issue before the jury.  The defendant argued that because DUA advised him that his consulting income was not "relevant," that he did not intentionally commit a fraud nor "hide anything," and in turn he could not be criminally responsible.  TRAN's false testimony bore upon an essential element that the government had to prove related to the wire fraud charges against him.  *See* First Circuit Model Jury Instructions, § 4.18.1343 (Element Three: "The defendant knowingly and willfully participated in this scheme with the intent to defraud.").[3]

TRAN also provided false testimony at trial about the terms of his consulting position with 1A Auto.  During TRAN's Day 5 testimony, TRAN was asked why he applied for PUA on March 15th, 2021, if he was allegedly in the process of negotiating a contract with 1A Auto.  TRAN testified, "… it was not a guaranteed position with [1A Auto] at all at that time." *See* Trial Day 5, p. 106.  However, on March 14th, 2021, TRAN and 1A Auto exchanged emails whereby TRAN accepted 1A Auto's consulting offer, and subsequently signed a consulting agreement on March 16th, 2021.  *See* Exhibit 28 page 5 and Exhibits 29 and 30.

<u>TRAN Attempted to Interfere in the Administration of a Fair Trial</u>[4]

___

[3]  Moreover, the defendant's guilty verdict indicates that the jury rejected his testimony and instead credited the testimony of Ms. Lerner.  *See United States v. Copeland*, 662 F. App'x 750, 755 (11th Cir. 2016) ("The jury's guilty verdict establishes that it rejected that testimony, and it was permitted to consider that testimony as substantive evidence of his guilt.");  *United States v. Barry*, 534 F. App'x 138, 145 (3d Cir. 2013) ("At sentencing, the government's burden is preponderance of the evidence —the jury's verdict demonstrates by a preponderance of the evidence that the jury discredited at least some of Barry's testimony and therefore warrants the District Court's application of the obstruction of justice enhancement.") (internal quotations omitted).

[4]  To be clear, the government acknowledges that the Probation Department does not view TRAN's Facebook posts and media interviews as grounds for an obstruction of justice enhancement.  *See* PSR, p. 38.

TRAN's attempts to interfere in the jury process also justifies application of the obstruction of justice enhancement.  The morning of Trial Day 1, the *Boston Globe* published an article titled, "Trial begins Tuesday for ex-state senator Dean Tran accused of illegally obtaining COVID unemployment benefits."[5]  Contained in this article are quotes and summary from an interview the Globe had conducted with TRAN the previous night on the eve of the trial. The article reads, "In an interview Monday night, Tran denied the charges and claimed the US Attorney's office and federal investigators hold a 'political bias' against him because he leans to the right politically. He said he believes "none of this would have happened" if he were a Democrat or a private citizen outside the political arena." The article continues with TRAN's comment, "I am looking forward to the trial and my attorneys and I are looking forward to exposing the lies, the corruption, and the politically motivated office of the US attorney."

TRAN also attempted to obstruct justice through numerous inflammatory Facebook posts.[6]  On the eve of the first day of trial, on September 2, 2024, TRAN posted to the Political Account, "For Immediate Release RE: U.S. v Tran Trial Commence 9/3/24 Contact: Dean Tran, 978 855-9622," and was followed by a message that included the following, "[t[he US Attorney's office and certain federal agents used tactics such as bullying, intimidation, harassment, coercion, and threat. When they did not get their way, they misled the grand jury with bias and false statements to secure their indictments."  The post further stated, "[t]he MA

---

[5]  The Court gave the jury preliminary instructions on the first day of trial ordering, "[D]o not read any news stories or articles about this case or anyone involved with it."    Trial Transcript, Day 1, at 129.

[6] As of January 7, 2025, Dean Tran's personal Facebook account, "Dean A." (hereinafter, the "Personal Account") is a public page with approximately 3,100 friends and Dean Tran's political page "Dean A. Tran," (hereinafter, the "Political Account") is a public page with approximately 7,900 followers. A public account on Facebook is available to the public, regardless the existence of any political relationship, or one's possession of their own Facebook account.  *See* https://www.facebook.com/help/203805466323736/?helpref=uf_share.

US Attorney's office has conditioned and brainwashed the public to believe their press releases and indictments to be factual. Their case against me is far from factual."[7]

The next day, September 3, 2024, following the first day of trial, TRAN, with no proof or evidence, accused the case agent of providing "false and misleading information" to the jury and claiming that she lied (again with absolutely zero evidence for his wild claims).  On September 7, 2024, Howie Carr of the *Boston Herald* wrote an article focused on TRAN's daily Facebook posts.

After the Howie Carr article ran and the government brought it to the attention of the Court, the Court expressed its concern that the defendant was attempting to interfere in the trial process:

> Okay. So I need to do a voir dire of the jury when they come in. I don't want to direct their attention to Howie Carr in particular, but I'll ask whether or not they were exposed to any of this. And I'm obviously concerned the defendant is attempting to affect media coverage is another way of saying the defendant is attempting to affect the fairness of the trial.

*See* Trial Day 5, p. 13.

The Court's observations speak to the history and characteristics of TRAN.  TRAN made such inflammatory and incredible statements that had no basis in fact.  His outrageous claims ring hollow with no evidence backing up his claims against the investigators and prosecutors. He certainly attempted to gain attention to his outlandish claims and poison the ability for the Court to hold a trial based on the law and evidence.  TRAN not only posted his comments to his Facebook pages but sought for numerous media outlets in Boston to cover his trial.  TRAN did get the attention of Howie Carr, although Carr portrayed TRAN in an unflattering manner that

---

[7]  The conclusion of TRAN's post included hyperlinks to various news outlets' Facebook pages. These outlets included Boston 25 News, WCVB Channel 5 Boston, 7News- WHDH Boston, NBC Boston, The Boston Globe, Boston Herald, Worcester Telegram & Gazette, Fox News and Turtleboy-Only Fans.

nevertheless risked jeopardizing the fairness of the trial which was already underway.  Moreover,

TRAN continued his Facebook posts during the trial *even* after this issue was presented to the

Court and the Court advised him that it was considering a gag order:

> I do not want a whiff of a jury nullification, I don't want hear about politics and
> corruption of the justice department.  That is not properly part of this trial, the
> defendant's opinions in that regard.

The Court further stated:

> As to whether I'm going to issue a gag order, I'm just not prepared to do that on
> the fly at five minutes before nine.  I want to see what the articles are and I want
> to get a grip on what's going on here.  I'm unhappy.  I'm going to leave it at that.

*See* Trial Day 2, p. 26.

Two days later, when this issue again arose because of continued Facebook posts by the

defendant, the Court again brought up a potential gag order and again expressed concern about

the defendant's conduct interfering with the right to a fair trial:

> Well, protected speech has its limited including interfering with a fair trial.  All
> right . . . . I may issue an order directing the defense to show cause why I should
> not issue a gag order.  But for now I need to read this and think about it.

*See* Trial Day 4, p. 13.

## THE 3553(A) FACTORS

### A.  The Nature and Circumstances of the Offense Warrant a 24-Month Sentence

The nature and circumstances of TRAN's crimes warrant a prison sentence of 24 months.

TRAN committed a wire fraud scheme over the course of several months, committing fraud on

each of the weekly unemployment certifications that he filed online.  TRAN also committed tax

fraud by underreporting rental income and in 2021 omitting his consulting income.  TRAN stole

unemployment benefits that were intended for people who, unlike TRAN, were experiencing true

economic hardship during the COVID-19 pandemic.  The PUA program was certainly not

intended for someone like TRAN who owned multiple properties and held retirement accounts with balances of several hundreds of thousands of dollars.[8]

As a former state senator, TRAN was keenly aware of the importance of legislation like the CARES Act that created the PUA program and what it meant to people out of work because of the COVID-19 Pandemic.  Indeed, TRAN himself claimed that he lost reelection in 2020 because "he was unable to campaign because he was spending most of his time helping constituents get through the Covid-19 pandemic by connecting them with resources."  *See* PSR, ¶ 114.  Unfortunately, it appears that TRAN used all his expertise on COVID-19 resources to benefit himself illegally while losing sight of the true purpose of public service and this important aid program.

TRAN applied for PUA benefits just one day after he accepted the consulting position and he had visited the New Hampshire headquarters of 1A Auto, where he touted his quality assurance background.  TRAN went through an entire onboarding process, negotiated his salary, and signed numerous documents with 1A Auto to confirm his employment, all the while he lied under the penalty of perjury to the DUA and claimed to not be working because of COVID-19. TRAN filed certifications weekly with the DUA at the same time he himself drafted invoices demanding payment for consulting services that he sent each week to Gayle Lang at 1A Auto. 1A Auto had no idea that TRAN was collecting unemployment benefits on the side while he was working for them.

Moreover, though TRAN knew the purpose of PUA was to help people struggling financially due to the impacts of COVID-19, he fraudulently collected PUA funds, while at the

---

[8]  TRAN's balance for his Fidelity IRA account in March 2021 (the same month he applied for PUA benefits) was approximately $670,000.  Trial Transcript, Day 5, at 148; Exhibit 85.  TRAN's ETrade account had a balance of approximately $105,000 around the same time, as well.  Trial Transcript, Day 5, at 148; Exhibit 89.

same time earning rental income and holding retirement accounts with a combined balance of close to a million dollars. TRAN's wire fraud scheme standing alone justifies a stiff prison sentence.

But TRAN deserves this sentence because he also cheated the IRS. HE underreported rental income in 2020, 2021 and 2023. It is noteworthy that TRAN's unemployment and tax fraud schemes happened simultaneously. TRAN filed his 2021 tax return on February 15, 2021, about a month before he started his unemployment tax fraud scheme in March 2021. TRAN underreported his rental income by about 50% in 2020, 2021 and 2022. The substantial amount of rental income that TRAN omitted from the tax returns show how willful his conduct was; his omissions were not inadvertent mistakes amounting to a few dollars. Instead, TRAN clearly and deliberately left off half of his rental income. And seeing that this was rental income, the money that TRAN omitted were funds that supplemented his paycheck far different from him not reporting his work income because of extenuating personal circumstances. TRAN's willfulness is also obvious given that his 2018 and 2019 returns reflected that he accurately reported rental income (*See* Exhibits 44 and 45), but then he made the choice to stop reporting his rental income starting with his 2020 tax return. Moreover, while TRAN cut his reported rental income, he continued claiming the same expenses. This shows that he willfully failed to report his rental income and that it was not the result of some innocent mistake.

### B.  TRAN's History and Characteristics Warrant a 24-Month Sentence

TRAN is deserving of a high-end guideline sentence of 24 months because he attempted to obstruct justice, he interfered with the trial process, he continues to blame others and he derides the rule of law, all while demonstrating zero acceptance of responsibility. TRAN clearly attempted to interfere with the Court's ability and the government's right to conduct a fair trial.

TRAN posted numerous times on Facebook during the trial and continued to post *even after* this issue was raised to the Court and the Court admonished TRAN for his attempts to taint the trial by influencing jurors.[9]  TRAN's Facebook posts were nasty and personal.  Not only did he attack the prosecutors and investigators, but he also lodged personalized and specific attacks against witnesses who were subpoenaed to testify and honored their duty to testify truthfully.

TRAN's deceitful ways have touched numerous dimensions of this case and investigation. For example, TRAN attempted to mislead agents and prevent them from uncovering the truth when they interviewed him at his home about the employment letter from his sister.  TRAN insisted that he had received a bona fide job offer from her, and that she had signed the letter when she had not.

TRAN also took the stand and lied to the jury.  TRAN had the right to remain silent and hold the government to its burden to prove his guilt.  TRAN exercised his right to testify, but then he blatantly violated his oath to tell the truth.  TRAN claimed that DUA employee Debra Lerner gave him permission to work while collecting PUA, a proposition that Lerner unequivocally repudiated on the witness stand.  Even an exercise as solemn and weighty as raising his right hand and swearing to tell the truth in a United States courthouse could not deter TRAN from continuing his fraudulent and deceitful ways.

Moreover, as he did during trial, TRAN has continued to post messages on Facebook. TRAN's posts include arguments and attacks with no support, and they demonstrate that he continues to deny any wrongdoing despite the overwhelming evidence of his guilt.  For example, on September 11, 2024, TRAN wrote, "Through the trial, we exposed an agent lying to the grand

---

[9] For example, the defendant posted to Facebook the afternoon/evening of September 4, 2024 after the Court had admonished the defendant earlier in the day for his posts.

jury to secure the indictment," and on September 18, TRAN continued this theme posting, "Why did they indict (the lead federal agent admitted she lied to the grand jury), charge, and convict me of these issues that are of administrative nature?"  TRAN's Facebook posts since trial show that he has not accepted responsibility for his actions despite the trial record's significant evidence of fraud, including: TRAN's own bank records showing his consulting income; TRAN's own invoices for consulting income; TRAN's own emails requesting payment for consulting work; TRAN's own fraudulent unemployment weekly certifications; and TRAN's own tax returns from 2020, 2021 and 2022 concealing income.  The trial record shows that while TRAN makes baseless accusations against government personnel, the actual evidence in this case proves his guilt beyond any doubt.

TRAN also deserves a prison sentence of 24 months because of his personal history. Unlike many defendants who appear before this Court, TRAN, by his own statements and admissions, had a stable and loving upbringing.  TRAN's personal history reveals that his family encountered substantial hardships and difficulties in immigrating to the United States.  Despite these obstacles, TRAN said he enjoyed "great" relationships with his parents. PSR ¶ 92. He reported that he never witnessed any domestic abuse or violence while growing up, and his parents did not have substance abuse problems.  PSR ¶ 112.  TRAN reported that he did not experience any physical or sexual abuse.  Moreover, the PSR further provides numerous examples of TRAN claiming how important family is to him.  TRAN said his "first responsibility" is to provide for his family. PSR ¶ 92.  TRAN further stated that "[h]e takes any opportunity to be with his family" and that it is difficult for him "to even go a day without spending time with his family."  However, despite having the support of a loving and stable family, TRAN chose to commit the fraud schemes for which he was convicted.  The fact that he

has such a strong support system is further evidence that his crimes were motivated out of greed and opportunity, and not out of necessity.

TRAN worked as a State Senator and City Councilor. He could have used his extensive skills and education for good, but instead used them to commit fraud schemes. The Court should consider that TRAN's sophistication and knowledge from his schooling and professional background certainly contributed to the extent of his criminal conduct.

TRAN stands in stark contrast to many, if not most, defendants who appear before this Court. TRAN has a bachelor's degree from Brandeis University. PSR ¶ 109. TRAN worked for Avid Technologies from 2000 to 2017 as a Manager/Engineer. PSR ¶ 115. From 2017 to 2020, he was a State Senator, where he earned $115,000. PSR ¶ 115. TRAN was a Consultant for 1A Auto from March to September of 2021, and he became a full-time employee of 1A Auto in September 2021, now earning $140,000 annually. PSR ¶ 112. Therefore, TRAN clearly did not commit his fraud schemes out of necessity or other unfortunate circumstance. He did not need unemployment income; he filed claims for unemployment because he saw it as an easy way for him to earn more money despite the fact the program was for people in far different circumstances than TRAN. Likewise, TRAN cheated on his taxes with the same greedy motives. And TRAN did all of this as a former public official; the very body he was supposed to serve – the government – ironically became the victim of his lies and deceit.

### C. A Sentence of 24 Months Reflects the Seriousness of the Offenses, Promotes Respect for the Law, Provide Just Punishment and Serves the Goals of Adequate Deterrence

A prison sentence of 24 months is also necessary to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment and to serve the goals of deterrence.

First, a sentence of 24 months will reflect the seriousness of TRAN's offense. TRAN took advantage of a COVID relief program, and he committed tax fraud. These are serious

offenses.  Moreover, TRAN's fraud shows particular arrogance and willfulness by him.  When DUA suspended TRAN's PUA payments, instead of stopping his fraud, TRAN doubled down and appealed their decision all the while claiming that he had a job offer from his sister.  He misled DUA in both his written and oral submissions regarding the job offer and convinced them to reinstate his benefits, all of which was based on fraud and deception by TRAN.

Moreover, TRAN clearly willfully omitted and concealed income from the IRS.  TRAN's 2018 and 2019 tax returns show that TRAN knew how to properly report his rental income and expenses, but starting in 2020, TRAN decided to conceal about 50% of his rental income, all the while taking the same amount of expense deductions.  TRAN also concealed his consulting income from his tax return in 2021 because he knew if that income was included on his tax return, then his unemployment income fraud also would have been revealed.

Second, a sentence of 24 months will promote respect for the law.  TRAN's crimes were serious offenses because he defrauded essential government programs.  As testimony from Jennifer Lavin of the DUA showed, programs like the PUA program rely on the honesty of beneficiaries.  This imperative was especially important when the government was determined to allocate aid as quickly as possible.  The government simply does not have the resources to audit and check every unemployment claim.  Our tax system works similarly.  It, too, relies on the honesty and integrity of the taxpayer to accurately report their income on their tax returns.  A substantial prison sentence will show the community that our laws have teeth and should not be exploited for one's own personal benefit.  This factor is especially important in this case because of TRAN's complete and utter contempt for the law and legal process throughout the investigation and prosecution against him.  TRAN has exhibited no respect for the law.

A sentence of 24 months is also a just punishment for TRAN.  TRAN's conduct during and after the trial show he deserves severe punishment.  He perjured himself, ignored clear Court directives regarding his Facebook posts, and continues to deny any responsibility for his fraud schemes.  TRAN is college-educated, has had multiple positions in the corporate sector and he is also a public servant.  Despite this background, he took advantage of a program intended for our vulnerable fellow citizens who were suffering real financial hardships during the pandemic.  TRAN knew what he was doing because he had a consulting gig at the same time he collected unemployment, and he also repeatedly omitted material amounts of income from his tax returns.

Instead of accepting responsibility for his actions, TRAN has blamed others.  He tried to cast blame on Debra Lerner.   He used his children to get PUA benefits, claiming that his care for them prevented him from working.  He also sought to blame the PUA system itself, claiming that he made a mistake in checking boxes on the weekly certifications even though his whole career was focused on quality assurance, and he checked the same boxes more than two-dozen times.

Deterrence is important in this case.  TRAN's testimony during the trial, including perjury and his mocking of prosecutors and federal agents on Facebook prove the need for adequate deterrence.  TRAN was a public official.  He was entrusted to uphold the law and to serve the people.  But TRAN's crimes show that his motivation was not to serve his constituents, but to line his own pockets.  Because public officials are supposed to serve a greater good, a substantial term of imprisonment will deter other public officials from violating the public trust and committing crimes.  Moreover, the U.S. Sentencing Guidelines explicitly note that general deterrence is particularly important in tax prosecutions:

> The criminal tax laws are designed to protect the public interest in preserving the integrity of the nation's tax system.  Criminal tax prosecutions serve to punish the

violator and promote respect for the tax laws. Because of the limited number of
criminal tax prosecutions relative to the estimated incidence of such violations,
deterring others from violating the tax laws is a primary consideration underlying
these guidelines. Recognition that the sentence for a criminal tax case will be
commensurate with the gravity of the offense should act as a deterrent to would-
be violators.

*See* Introductory Commentary, USSG § 2T1.1.

Moreover, there is a need for specific deterrence because of TRAN's utter disrespect for

the law and the legal process. TRAN has not accepted responsibility for his actions. His

misguided and empty claims of selective prosecution show that he is not above committing fraud

again to serve his own interests. His refusal to accept responsibility and claims that he did

nothing wrong suggest that he would reoffend again and make it especially important that his

sentence reflect the importance of deterrence. Indeed, based on his history and characteristics, it

appears only a substantial period of incarceration will deter him from future crimes. The

dynamics of TRAN's fraud, from his lies to initiate unemployment benefits to his lies during his

unemployment hearing; from his lies on federal tax returns to his attempts to undermine the trial

process; underscore the importance of this Court's sentence to send him the message that his

deceptive practices must stop when this case is over.

## CONCLUSION

For those reasons stated above, the government respectfully requests a sentence of 24

months in prison, a period of supervised release of 3 years, a fine of $75,000, restitution,

forfeiture, and a $2,300 special assessment.

Respectfully submitted,

JOSHUA S. LEVY
UNITED STATES ATTORNEY

By:    /s/ *John T. Mulcahy*
       Dustin Chao
       John T. Mulcahy
       Assistant U.S. Attorneys

Dated: January 13, 2025

## Certificate of Service

This is to certify that I have served counsel for the defendant a copy of the foregoing

document by electronic mail via the ECF system.

/s/ *John T. Mulcahy*
John T. Mulcahy
Assistant U.S. Attorney

Dated:  January 13, 2025